BOUNDS et al. v. STEPHENSON et al.*
(No. 7441.)

(Court of Civil Appeals of Texas. Dallas.
June 10, 1916. Rehearing Denied
July 1, 1916.)

1. CORPORATIONS ⊚⇒320(11)—LIABILITY OF OFFICERS—UNDUE EXPENDITURES.

Evidence *held* insufficient to show that defendant corporation president hired attorneys without proper authority, or without necessity for their employment, so that he could not be held liable to stockholders for the fees paid them.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1437; Dec. Dig. ⊚⇒320(11).]

2. CORPORATIONS ⊚⇒320(11) — LIABILITY OF OFFICERS—UNDUE EXPENDITURES—COLLUSION.

Evidence *held* insufficient to show that corporation officers were in collusion in fixing their salaries at an exorbitant figure, so that they could not be held liable to the stockholders for the amounts so expended.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1437; Dec. Dig. ⊚⇒320(11).]

3. CORPORATIONS ⊚⇒312(3)—LIABILITY OF OFFICERS—UNDUE EXPENDITURES.

The mere fact that, where by-laws required 10 days' notice of meeting to stockholders, the officers sent with the notice two proxy slips, one of which ran to the officers, and sent also a stamped envelope for return of the proxy, is insufficient to show mismanagement; the additional expense being slight.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1380, 1381; Dec. Dig. ⊚⇒312(3).]

4. CORPORATIONS ⊚⇒312(1), 317(3)—LIABILITY OF OFFICERS—UNDUE EXPENDITURES.

Where a corporation was authorized to act as surety, and its officers in its name signed an undertaking for the brother of the president, and on default suffered judgment against it, but took judgment over against the brother, and secured a lien on land to secure it, but did not release the judgment, such facts were insufficient to show mismanagement or fraud.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1376–1378, 1390, 1392, 1407; Dec. Dig. ⊚⇒312(1), 317(3).]

5. CORPORATIONS ⊚⇒294—LIABILITY OF OFFICERS—UNDUE EXPENDITURES.

Evidence *held* insufficient to show mismanagement of a surety corporation sufficient to warrant, on a stockholder's petition, removal of the president from office as trustee, with right to make loans for stock sales.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1263–1266; Dec. Dig. ⊚⇒294.]

6. CORPORATIONS ⊚⇒322—OFFICERS—EXCESSIVE SALARIES.

Salary of a corporation president cannot be held excessive, where there is nothing to show the duties exacted of him.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1365; Dec. Dig. ⊚⇒322.]

7. CORPORATIONS ⊚⇒553(1)—RECEIVERS—APPOINTMENT—WHEN PROPER.

The power to appoint a receiver, especially of a corporation, will not be exercised, except upon a very grave necessity, and upon a clear showing that the applicants' rights imperatively demand the appointment, and that without it he had no adequate remedy, and is in danger of suffering irreparable loss.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2201, 2210, 2213–2216; Dec. Dig. ⊚⇒553(1).]

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Suit for injunction and other relief by W. R. Bounds and others against J. B. Stephenson and others. Judgment for defendants, and plaintiffs appeal. Affirmed.

C. M. Smithdeal, of Dallas, for appellants. Smith, Robertson & Robertson and Locke & Locke, all of Dallas, for appellees.

RAINEY, C. J. We take from appellants' brief the statement of the case, as follows:

Appellants for themselves, other stockholders similarly situated, and for the General Bonding & Casualty Insurance Company, sued John B. Stephenson, James A. Stephenson, George W. Riddle, A. Ragland, T. A. Smith, Frank Ezell, J. H. Christler, and the General Bonding & Casualty Insurance Company, and alleged, in substance: That appellants are stockholders of the General Bonding & Casualty Insurance Company, which company was incorporated for the purpose of transacting all kinds of surety, casualty, and liability insurance. All defendants, except James A. Stephenson and J. H. Christler, were alleged to be directors, John B. Stephenson was alleged to be president, and T. A. Smith secretary, of said company. It was alleged that John B. Stephenson had dominated the company since its organization; that by virtue of agreements and conspiracies between John B. Stephenson, James A. Stephenson, J. H. Christler, George W. Riddle, A. Ragland, Harry L. Seay, and others, John B. Stephenson had retained himself in the offices of director and president of the company, and had voted to pay himself large sums of money in the way of salaries; that John B. Stephenson and his brother, James A. Stephenson, and their partner, J. H. Christler, acquired in their effort to control the company certain shares of the company's stock, and in order to sell said stock lent to the purchasers and prospective purchasers thereof the company's money, at 6 per cent. per annum, with which to pay therefor, when

---

⊚⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Application for writ of error pending in Supreme Court.

the company could have lent its money at 8 and 10 per cent.; that said John B. Stephenson paid large sums of money to Locke & Locke, and other attorneys, unlawfully and improperly, the company at the time having a general attorney, who was employed and paid for the purpose of attending to its legal affairs; that in order to acquire and hold control of the company John B. Stephenson sent out letters, signed by the General Bonding & Casualty Insurance Company, asking stockholders for proxies, authorizing him, or some of his copartners, or dummy directors, to vote for such shareholders; that said campaigns for proxies were conducted at the expense of the company; that said John B. Stephenson, J. H. Christler, and other officers, as directors of the company, voted themselves salaries; that John B. Stephenson and his copartners made a contract with J. H. Christler to elect him a salaried officer of the company, and pay him a salary, in consideration for his purchase of stock from a copartnership composed of John B. Stephenson, J. A. Stephenson, and others, and that this contract was carried into effect, and a salary was paid to J. H. Christler, although said Christler was wholly incompetent and unfit to discharge the duties of the office; that said John B. Stephenson, as president of the company, obligated the company on a bond in the penal sum of $30,000, conditioned that James A. Stephenson, T. H. Stephenson, and D. D. Crockett would pay a note executed to W. C. Tyrrell, and that said T. H. Stephenson and D. D. Crockett would sell a certain number of shares of the stock of the Republic Trust Company at a certain price per share; that James A. Stephenson, T. H. Stephenson, and John B. Stephenson are brothers; that a judgment was obtained by W. C. Tyrrell against the company on said bond in the sum of approximately $24,000, and a judgment by the company over against James A. Stephenson; that the company was compelled to pay the judgment to Tyrrell and borrow the money for said purpose, but that John B. Stephenson had failed and refused to collect the judgment from his brother, James A. Stephenson, although the plaintiffs, as stockholders, demanded that such judgment be collected, and pointed out property that could be levied on, and out of which said judgment could be collected; that on account of the unlawful expenditures made by John B. Stephenson, plaintiffs, as minority stockholders, were entitled to a judgment in behalf of the company against John B. Stephenson, and were also entitled, in behalf of the company, to have the judgment against John B. Stephenson, James A. Stephenson, Harry L. Seay, Frank Ezell, George W. Riddle, T. A. Smith, and T. L. Camp, by voting their own stock and proxies, acquired in a campaign conducted at the expense of the company, had voted to liquidate the company and to make themselves, with exception of James A. Stephenson and Harry L. Seay, liquidating agents, but, after so voting to liquidate, said John B. Stephenson, George W. Riddle, T. A. Smith, Frank Ezell, and T. L. Camp delivered all of the property and assets of the company, amounting in value to over $300,000, into the hands of John B. Stephenson, and by an instrument in writing, purporting to be a resolution of the directors, gave John B. Stephenson plenary power to sell the assets of the corporation at any price, to retain all of the officers and employés of the company at exorbitant salaries, and thereby dissipate the company's assets, and to do any and all other things which he (John B. Stephenson) might desire to do with regard to the properties and assets of said company; that it had become manifest that the object for which the corporation was organized could not be attained, and upon this becoming manifest the stockholders of the company owned the assets jointly, and were entitled to have a receiver appointed to take possession of them and wind up the affairs

of the company; that John B. Stephenson, to whom the so-called directors delivered the assets of the company, with full power to dispose of the same, was insolvent, and not only insolvent, but by his conduct in the handling of the business of the company, particularly with reference to his said refusal to collect the judgment from his brother, James A. Stephenson, and his conduct with reference to selling stock belonging to his brother and himself to persons to whom he had lent the company's money at 6 per cent. to pay for the stock, had shown himself to be an unfit person to act as trustee for the stockholders in winding up the company's affairs. The suit was dismissed as to J. H. Christler. Plaintiffs, in behalf of the General Bonding & Casualty Insurance Company, asked for judgment against John B. Stephenson for the moneys unlawfully expended by him for attorney's fees, salaries, conducting campaigns for proxies, etc., and also, in behalf of said company, prayed for a mandatory injunction requiring the collection of the judgment against James A. Stephenson, and for the appointment of a receiver to take possession of the assets and wind up the affairs of the General Bonding & Casualty Insurance Company. The case was tried before the court, and judgment was rendered that plaintiffs take nothing, and that the defendants recover of plaintiffs their costs, from which judgment this appeal is taken.

[1] The first error assigned is:

"Evidence showing, without contradiction, that under the by-laws of the General Bonding & Casualty Insurance Company the executive committee had the sole authority to appoint an attorney, and that the executive committee employed T. L. Camp as attorney for the company, who was paid a salary of $250 a month to attend to the legal business of the company, and further showing that John B. Stephenson, the president of the company, without authority, employed other attorneys to perform the services which the said T. L. Camp was obligated to perform by the terms of his employment, and that John B. Stephenson paid from the funds of the company large sums of money, to wit, approximately $7,000, to Locke & Locke and other attorneys, who were not employed by the executive committee, and who were employed by said John B. Stephenson without authority, the court erred in holding that the plaintiffs, as minority stockholders of the General Bonding & Casualty Insurance Company, were not entitled to recover, in behalf of the corporation, and from John B. Stephenson, said sums so unlawfully expended by him."

The General Bonding & Casualty Insurance Company was incorporated on November 20, 1910, for the purpose of transacting all kinds of surety, casualty, and liability insurance business. J. B. Stephenson was its first secretary, and remained so until in January, 1912, when he was elected president and general manager. The by-laws of the company provide that the general attorney shall have charge of the legal department of the company, and shall advise concerning claims made upon it, and litigation in which it may be involved. Appellant says that:

"The evidence shows that a by-law was adopted conferring upon the executive committee of the company authority to employ counsel. It affirmatively appears that authority was not vested in the president of the company, John B. Stephenson, to employ attorneys."

But in support thereof he does not recite the record page where it can be found. This statement is controverted by appellee, who contends that Stephenson had the authority

usually incident to the combined office of president and general manager. Mr. T. L. Camp was employed as the general attorney for the company and testified:

"As general attorney of this company, it is true that I never refused to perform any services I was called upon to perform, except possibly in one suit. I have suggested the employment of counsel in many cases, and I suggested the employment of counsel in this case, tried in this court a few days ago, that I did not appear in. That was the only case in which I refused to appear, and that was not a refusal, but a suggestion that other counsel be employed. All these expenditures for attorney's fees paid out by this company have not been paid out under my direction. Mr. Stephenson has employed counsel in cases that were not employed under my direction; but he had usually talked to me about it, either before or after, and I have always acquiesced in it. I agreed to it. * * * I know that the by-laws provide that the executive committee shall appoint an attorney to look after the legal affairs of the company, but I do not recall the exact wording of it. I recall that there is such a power in the executive committee, and that it specifies the duties of the general attorney."

He further testified that the company had considerable litigation in different parts of the state, and he assumed that he himself had the right to employ other counsel, and that his understanding of the duties of the general attorneys were as above stated from the by-laws; that he did not understand that it was his duty to go all over the state, trying all the cases that arose; that, on the contrary, it was understood that he had authority to employ counsel to take charge of litigation in other parts of the state, and that as a matter of fact he had done so a great many times. It does appear that both Camp, general attorney, and Stephenson, as president and manager, did employ, at different times, counsel who rendered services for the company; but it does not appear definitely how much was paid by each. These services were accepted by the company, and Stephenson's acts were ratified by the directors. There is no fraud charged on the part of Stephenson in employing said counsel, nor is it shown that such employment was not necessary, or that the fees paid were unreasonable. We think, under the facts shown and the decision in Ice Co. v. Crawford, 18 Tex. Civ. App. 176, 44 S. W. 877, the court did not err in holding against the appellant.

[2] The appellant's second assignment of error is:

"The evidence showing without contradiction that George W. Riddle was a dummy director, subject to the influence and control of John B. Stephenson, and further that John B. Stephenson and T. L. Camp were jointly interested in 307 shares of the stock of the company, which they held under a voting trust, which obligated T. L. Camp to vote his interest in said stock for John B. Stephenson, and, further, that before each director's meeting, at which John B. Stephenson was elected to a salaried office, he consulted with George W. Riddle about the amount of salary he should have, and procured the promise of George W. Riddle to vote to fix his salary at the amount suggested by John B.

Stephenson, and that, at each directors' meeting at which John B. Stephenson's salary was fixed and voted, John B. Stephenson, J. H. Christler, and T. L. Camp, all of whom were drawing salaries from the company, voted to fix each other's salaries, and that George W. Riddle joined in their vote to fix their salaries, and voted, as he had agreed to, for whatever salary John B. Stephenson desired as president of the company, and further showing that there was community of interest and collusion between them with regard to fixing said salaries, and that the salaries of John B. Stephenson and J. H. Christler could not have been voted and paid to them without the votes of T. L. Camp and George W. Riddle, and that the votes of George W. Riddle, T. L. Camp, J. H. Christler, and John B. Stephenson were necessary to fixing and paying the salaries voted and paid to J. H. Christler and John B. Stephenson from and after the ——— day of January, A. D. 1912, the court erred in holding that the plaintiffs, as minority stockholders, were not entitled to recover in behalf of the corporation, against John B. Stephenson, the amount of salary so unlawfully voted and paid from the funds of the company to John B. Stephenson and J. H. Christler from and after the ——— day of January, A. D. 1912."

This assignment, in effect, attacks the acts of the directors, in that there was collusion between them in the fixing of salaries of Stephenson, president, and Christler, secretary, and that Riddle was the tool of Stephenson and under his control in acting for the concern, and charges that the evidence is uncontradicted to show this. On the proposition of Riddle being a dummy of Stephenson, it was shown: That he was the president of the First State Bank of Dallas, of which Stephenson was a patron, and from which he sometimes borrowed money, and in which the funds of this company were deposited, and with which it transacted its banking business. That Riddle owned one share of stock in this banking company, and had been a director of this company from its beginning. Riddle testified:

"* * * Since the organization of the company I have advised with John B. Stephenson frequently, and I usually had an understanding with him, and he frequently advised with me. I have had an understanding with him, and always supported him for president of the company, and always voted for him as director. As to the salary, that is a matter that has been discussed between us, and agreement reached between he and I, before the election. The records will show if I voted to raise his salary. My mind don't serve me just exactly that way. Before doing that he has always discussed the matter with me. He has always been that frank with me, and been that considerate of me."

Riddle was a man of substantial means and business standing. The company was organized in December, 1910. It had a board of 36 directors, among whom were both the appellants, who attended the first meeting. The company started out with too great an expense, there being eight salaried officers; the president receiving $5,000, Stephenson as secretary, $3,000. On March 14, 1911, Stephenson and Kneeland, secretary and vice president, respectively, addressed to the president a communication to the effect that expenses were too great and tendered

their resignations, to take effect immediately, and tendering their help in every way possible. The executive committee on April 11, 1911, considered this communication and refused to accept said resignations, and the salaries of the president, vice president, and secretary were reduced from $5,000, $3,000, and $3,000, respectively, to $2,400 each. The treasurer, medical director and agency director, whose salaries had been $3,000, $3,600, and $2,400 each, were retired, and the salary of the medical director was fixed at $100 per month. At the annual meeting of the stockholders January 9, 1912, 19 being present, including the appellants, salaries were fixed for president, $3,600; secretary-treasurer, $3,000; vice president, $3,600; and general attorney, $1,800. At this meeting J. B. Stephenson was unanimously elected president. In 1913 the board of directors was reduced from 36 to 7, and the president's salary was increased to $4,800. No vote was ever cast against Stephenson as president, and no officer voted to fix his own salary. There was no agreement existing between Seay, Stephenson, Camp, and James A. Stephenson with regard to the 307 shares of stock owned by them jointly, although the stock was always voted by them in harmony, but never against the wishes of J. B. Stephenson. In 1914 the board of directors elected were J. B. Stephenson, Harry L. Seay, George W. Riddle, A. Ragland, C. M. Smithdeal, W. R. Bounds, and T. L. Camp. Of these Stephenson and Camp were the only salaried officials.

While the evidence shows that the board of directors were harmonious, there being no friction among them, yet we do not think there was any collusion between them to act against the interest of the company and only for their interest. The evidence fails to show that either of them voted to fix their own salary, or that any salary was fixed by improper acts on the part of either director. There is nothing showing what the services of John B. Stephenson were worth as president, or that his salary was exorbitant. This assignment is overruled.

[3] Appellant's third assignment of error is:

"The evidence showing, without contradiction, that before each annual meeting of stockholders John B. Stephenson sent proxies to each stockholder, with his name, or the names of his partners and dummy directors, inserted therein; that he had said proxies printed at the expense of the General Bonding & Casualty Insurance Company; that he bought stamps to mail same out from the funds of said company, and inclosed stamped envelopes, the stamps on which were bought from the funds of said company; that he signed the name of the company to the letters calling for said proxies, as though it were the company itself asking the stockholders to send in said proxies; that he used the money of the company and the time of the employés of the company in sending out said letters to the stockholders, in order that he might retain his control and management of the company; and that he did, by such methods, obtain a sufficient number of proxies to enable him to elect such directors as he might choose, who would retain him in the control and management of said company, and that he did by these methods continue himself in control and management of the affairs of said company—the court erred in holding that the plaintiffs, as minority stockholders, were not entitled to recover, in behalf of said corporation and against John B. Stephenson, the amounts so unlawfully expended by him from the funds of the company."

The by-laws of the company require 10 days' notice to be given of each regular meeting of the stockholders, by mailing to each registered stockholder a written notice, addressed to him at his last address appearing upon the records of the company. The custom of the company was to send out a printed notice of the meeting, and to send with it two proxy forms, one printed on white paper and the other on blue paper. In the form printed on white paper the names of proxies were inserted, and in the form printed on blue paper no name was inserted, but a space was left to be filled in by the stockholder if he chose to be represented by some one other than those whose names were printed on the white blank. The notice, of course, was signed by the company through some officer, usually Mr. Stephenson. Several sets of notices and proxy forms appear in the statement of facts. They are similar in their terms. At the meeting of 1912 the white paper proxy form did not have the name of J. B. Stephenson on it, but for 1913 and 1914 his name did appear as one of the proxies. We see no objection to this way of procuring proxies for having sufficient shares of stock represented. No deception was practiced in securing proxies—every one was given an opportunity to vote for any one he chose to represent him in the meeting, and it seems to us that this manner of proceeding was fair, and insured practically a fuller meeting of stockholders than otherwise. The expense for printing the extra slips and sending them with the regular notices was but a trifle, and should not be considered.

[4] The fourth assignment, in effect, complains: That John B. Stephenson, as president of said company, signed the name of said company to a surety bond for $30,000 upon which his two brothers and another were principals. That said bond was sued on, that J. B. Stephenson and the other directors failed to make any defense to same, and that judgment was rendered against the company for $24,000, with judgment over against the principals. That Crockett and T. H. Stephenson, two of the principals, were insolvent. That James A. Stephenson, the other principal, had property out of which the judgment could have been collected. That said company borrowed money and paid judgment, and that at a meeting called to settle with James A. Stephenson his note was accepted, secured by lien on Western lands, which was done over the protest of appellants. That James A. Stephenson own-

ed certain shares of stock, which the directors refused to garnishee or to proceed to collect the judgment, all of which entitled appellant to a mandatory injunction.

Appellant was within its charter powers in becoming surety on said undertaking. It was also bound for the payment of the judgment rendered against it, and this much should be conceded; but the question is: Should the directors of appellant company have proceeded to the enforcement of the judgment against the Stephensons and Crockett, and not have made the agreement with James A. Stephenson for an extension of time for payment by him? John B. Stephenson, being a brother of James A. Stephenson, did not take part in the settlement made between James A. Stephenson and the other directors, and it does not follow that the other directors acted contrary to the best interest of the company in making the settlement. The judgment was not released in any way against James B. Stephenson, and he had given a lien on Western land to secure its payment. By enforcement of the judgment the land may have been sold under execution for much less than enough to pay the debt, while by pursuing a more lenient course in granting further time the debt might be paid. Taking this course rested with the directors, and the evidence shows that they acted in good faith, believing that the best interest of the stockholders would be subserved by pursuing that course. This latter view seems to have been adopted by the trial court, and we do not feel justified from the evidence in saying that he acted wrong.

[5] The fifth assignment of error complains of the court in rendering judgment for appellees and in not appointing a receiver, in that the uncontradicted evidence shows that John B. Stephenson, the president, dominated the directory, that the directory had failed to attain the object for which the company was incorporated, and that said Stephenson was insolvent and unfit for the office of trustee and the making of loans to facilitate stock sales.

We are of the opinion that the evidence is not uncontradicted or so conclusive one way that it required the trial court to appoint a receiver at the instance of appellants. It is true that the company had failed to succeed in its undertaking, and directory felt that its affairs should be placed in the hands of a trustee for liquidation, and John B. Stephenson was named as such trustee. This action was approved by a majority of the stockholders at a regular meeting. The unfitness of said Stephenson for the office of trustee was not shown. The evidence does not show that he was insolvent, or that he was dishonest or incapable to carry out the trust. It shows, on the other hand, that he was an experienced business man and regarded as a man of integrity and capability, that the directors conferred with him and acted in harmony with each other in conducting the affairs of the company, and it is not conclusively shown that he dominated them to the detriment of the company's interest. They were all men of reputable standing, and Riddle, Camp, Christler, and Seay were men of large means and were independent, and the evidence shows they were not dominated by Stephenson. That they should have trusted each other and worked in harmony for the interest of the company was to be expected.

We think the evidence fails to show the directory censurable for the transactions in making loans to facilitate the sale of stock as charged. While some censure may lie for the settlement of the Tyrrell judgment, yet it is no uncommon thing for some errors to be made by the best-managed businesses, and though a mistake was made in this transaction, the evidence does not show that the amount will not be ultimately recovered and the company recoup its loss.

[6] The evidence fails to show what work was required of the president, John B. Stephenson, and that the salary paid him was excessive. Without such proof, we are unable to say that he has received any greater salary than he was entitled to, and which he should have refused.

[7] That the evidence fails to show that the property would be administered with less expense by the appointment of a receiver than by the trustee appointed is at least doubtful, and we are unable to say that the court erred in its judgment.

"The power to appoint a receiver, especially of a corporation, will not be exercised, except upon a very grave necessity, and upon a clear showing that the applicant's rights imperatively demand the appointment, and that without it he has no adequate remedy, and is in danger of suffering irreparable loss." Investment Co. v. Crawford, 45 S. W. 738; Trust Co. v. Cowart, 173 S. W. 588.

We have given all the assignments due consideration, and have concluded that the evidence is sufficient to support the action of the trial court; therefore the judgment is affirmed.