W. C. HENGER et al., Petitioners,

v.

Lewis A. SALE, Respondent.

No. A–9098.

Supreme Court of Texas.

Feb. 20, 1963.

Rehearing Denied March 20, 1963.

James W. Leftwich, of Turner, Rodgers, Winn, Scurlock & Terry and Brundidge,

Fountain, Elliott & Bateman, Dallas, for petitioners.

Wm. Andress, Jr., Dallas, for respondent.

GREENHILL, Justice.

Lewis A. Sale brought this suit against the Bachman Center Corporation and three of its officers and directors, W. C. Henger, Sam P. Wallace, and Robert Moore. Sale was also a stockholder, officer and director of the corporation. He alleged that he sued on behalf of the stockholders to recover for the corporation on two separate counts: (1) to recover for the failure of the defendants to secure and carry out a contract for the sale of dirt from property of the corporation; and (2) to recover from Henger, Wallace, and Moore approximately $99,000 which he alleged was paid by the defendants to themselves without corporate authority and in breach of their fiduciary duty to the corporation. These defendants asserted that Sale had persuaded them to lend this money to the corporation for the purchase of a site upon which a shopping center was to be built; that the money was so used; and that when the property was sold, the corporation repaid these loans from the defendants.

Trial was to a jury. Judgment was rendered on the verdict of the jury against Henger, the president of the corporation, for $34,593.15, plus interest, growing out of the count for failure to obtain and carry out the dirt contract. Judgment was rendered in favor of the defendant Moore on the verdict on both counts. Judgment was rendered in favor of the defendants Henger and Wallace on the second count upon their motion to disregard certain jury findings.

The Court of Civil Appeals at Waco reversed that portion of the judgment against Henger for $34,593.15. It held that there was no evidence to support the jury's findings thereon. As to that portion of the case, judgment was rendered for Henger. 357 S.W.2d 774. We have examined the

record and briefs of the parties, and are of the opinion that the Court of Civil Appeals correctly announced the law of the case on this point. No useful purpose would be served by restating it here. In view of the length of this opinion, we here adopt that portion of the opinion of the Court of Civil Appeals designated "1. Defendant's Appeal" which is found on pages 775 and 776 of 357 S.W.2d.

As to the second count, the suit to recover from Henger, Wallace and Moore, the Court of Civil Appeals reversed and remanded the cause. It held that the defendant officers and directors did not discharge their burden of showing that the payments to themselves did not constitute unauthorized payment to themselves. 357 S.W.2d, pp. 777 and 778. It was upon this point that we granted a writ of error.

The facts regarding this second count are, in substance, these: In September of 1954, Sale got an option to purchase approximately 50 acres of land in Dallas from the Slaughter Estate for $605,000. The option contract called for the payment of $105,000 in cash, the balance to be secured by notes.

Sale started work to develop the project of a shopping center on the land he hoped to purchase under the option. He got George Dahl to prepare preliminary plans (Dahl's fees of $6,803.78 were eventually paid out of money of the Bachman Center Corporation from additional money advanced by the defendants or borrowed from a local bank). Sale also got a commitment from a large insurance company to finance the proposed venture provided major department stores were obtained as lessees of the Center and provided certain minimum rentals were contracted for.

Sale and Dahl had some sort of disagreement; and Sale had neither the $105,-000 downpayment to exercise his option nor the necessary prospective tenants for the proposed Center. Through Carl Crofford, Sale met Thomas F. Stewart, a financier and partner in Southwest Securities. Stewart introduced Sale to Henger, Wallace and Jack Vaughn of Dallas. Shortly before the expiration of his option, after conferences with Sale, the defendants Wallace and Henger and Jack Vaughn agreed to lend the money for the downpayment. Wallace and Henger each put up $26,250, and Vaughn put up $52,500.

Fischbach & Moore of Texas Inc. (herein referred to as Moore) and Jack Corgan subsequently replaced and paid Vaughn. Each of them put up $26,250.

The corporation had an authorized capital stock of 4,000 shares, of which 2,000 were issued at a par value of $5 per share. As pertinent here, the ownership of the stock was as follows:

| | | | |
|---------|-----------|-----------|---------|
| Moore | 405 shares | (20.25%) | $2,025. |
| Henger | 405 shares | (20.25%) | 2,025. |
| Sale | 700 shares | ( 35% ) | 3,500. |
| Wallace | 405 shares | (20.25%) | 2,025. |
| Corgan | 85 shares | ( 4.25%) | 425. |
| Total paid-in capital stock | | | $10,000. |

For all intents and purposes, there were but five stockholders, four of whom are parties to this suit. Corgan, the fifth stockholder, here seeks no relief.

Bachman Center Corporation was thus incorporated in September of 1955. The land on which Sale had an option was purchased. The checks of the defendants Henger, Wallace and Moore were handed to the secretary of the corporation who in turn handed them to the representative of the closing title company and the seller. The $105,000 downpayment for the land was furnished, as pertinent here, as follows:

| | |
|---------|-----------|
| Henger | $26,250. |
| Wallace | 26,250. |
| Moore | 26,250. |
| Corgan | 26,250. |
| | $105,000. |

Sale put up none of the money.

Each of the defendants, as well as Mr. Stewart, testified that they loaned the mon-

ey to the corporation, and expected to be repaid. Sale did not deny that the money was loaned to the corporation. His points are that the corporation was not authorized to borrow the money, and there was no authority for its repayment. This will be discussed below.

When the corporation was formed, all of the stockholders were named officers and directors. Thomas F. Stewart was made president, and remained as president for two years. He was not a stockholder. All the stockholders were made vice presidents.

Promissory notes were issued to Corgan, Henger, Wallace, and Moore in September of 1956, signed "Bachman Center Corporation" by Stewart as president. Each note was for $26,250, due in one year, and bearing 5% interest. These notes were renewed from time to time. Sale points out that there was no resolution of the board authorizing the notes, and this is true.

The financial statement of the Bachman Center Corporation for September 30, 1956, prepared by Alford, Meroney & Co., certified public accountants, lists the following:

### Liabilities

Current Liabilities: notes payable:

| | |
|---|---|
| Fischbach & Moore, 5%, due Sept. 16, 1957 | $26,250. |
| Sam P. Wallace & Co., 5% due Sept. 16, 1957 | 26,250. |
| Henger . . . 5%, due Sept. 16, 1957 | 26,250. |
| Jack Corgan, 5%, due Sept. 16, 1956 | 26,250. |
| Republic Natl. Bank, Dallas, 4%, due Feb. 7, 1957 | 10,000. |
| Jack Corgan—unsecured | 6,250. |

These notes were carried as current liabilities, notes payable, on the balance sheets of the corporation in its statements of September 30, 1957, and September 30, 1958. The payments here in controversy were made on October 16, 1958.

If the shopping center were successful, each of the parties hoped to profit: Sale was to receive commission from the leases; Henger was a building contractor; Moore was an electrical contractor; Wallace was a mechanical contractor; and Corgan was an architect.

The promotion of the Center did not do well. None of the officers or directors was paid any salary; each was to pay his own expenses, and none was paid any expenses except Sale. Sale's expenses were paid to San Francisco and St. Louis. He was attempting to obtain major companies as tenants for the shopping center. Sale made several other trips to New York, Chicago, Houston and other cities. He testified that he was out a substantial amount for these trips. A resolution of the directors of

which Sale does not complain, however, required that no expenses be paid anyone without approval of the executive committee. Except as noted above, none was approved. Sale has no pleadings for expenses.

As the corporation existed, it had no income or profit. The only monies expended were obtained from loans from a local bank or from Henger, Wallace and Corgan. Sale contributed no additional funds to the corporation after his purchase of stock.

The minutes of the corporation for September, 1956, show that all of the stockholders including Sale were present at a meeting on that day. The minutes continue, "Jack Corgan brought up the matter of the $32,500 loaned by him to Bachman Center, with $26,250 secured by a note signed by Fritz Stewart as President. * * * That note [was] due and payable September 16, 1956. The remaining $6,250 being an unsecured open loan to Bachman Center Corporation." The matter was discussed. Wallace pointed out that the success or failure

of the venture should be settled within about 60 days. Henger agreed; and said that if the desired leases were not consummated, he was ready to sell the 50 acres.

There is no indication that Sale did not know what the $26,250-note was, where it came from, or what it was used for. Corgan was eventually paid his $26,250 by the corporation, and he was not made a party to this suit by Sale. His note was for the same amount and purpose as that of Henger and Wallace.

The minutes of the stockholders' meeting of December 21, 1956, reflect the beginning of this suit. They read:

"All of the stockholders of the corporation being present, the meeting thereupon duly convened.

"Thereupon, Mr. Lewis Sale stated that in his opinion a budget should be established for the company and provisions made for necessary funds. He further said that it was his opinion that the company lacked organization and administration; that such lack of organization and administration had resulted in the failure to reduce to writing an agreement which he contended Messrs. Henger, Wallace Fischbach and Moore had made with the company to furnish working capital to the company; that it was his understanding that such named persons would advance necessary funds for the purchase of the shopping village site and any other necessary working capital; and that the company was to execute and deliver to such persons notes for any amounts so advanced, which were to be repaid by first, applying to the notes, fees to be collected by such persons as contractors for the construction of the buildings contemplated, and the balance, if any, was to be paid to such persons out of the income of the company. Messrs. Henger, Wallace, Fischbach and Moore each disagreed with Mr. Sale's contentions and statements, and drafted the following statements which the Secretary was instructed to include in the minutes:

*"Mr. Henger's Statement*

" 'When I was approached in regard to the Bachman Center Corporation project, it was explained to me that I would purchase 405 shares of stock and that I would make a loan of $26,250 to the corporation, such money to be used to make the first payment on the purchase of the property. I understood that Henger Construction Company was to be the General Contractor on this project. It was further explained to me that the permanent financing would be sufficient to clear the purchase price of the property and pay for all construction costs, with the possible exception of the fees to the general contractors and the mechanical contractors. I have never made any agreement, other than the above mentioned loan to finance any portion of the project.'

*"Mr. Wallace's Statement*

" 'My understanding was that I was to advance the corporation approximately $26,250 and accrued interest at 5% to be used for the purchase of the property and that I was to receive a note from the corporation for the amount advanced. This note was to be paid off when the final financial arrangements were made. It was discussed informally on several occasions by different stockholders that as the project developed I would have a contract for the plumbing, heating, and air conditioning at a set fee. At no time did I ever agree to put up one-third or any other portion of the financing other than what money could be borrowed against the project.'

*"Mr. Moore's Statement Made on behalf of Fischbach & Moore*

" 'The first information I had relative to the financing of the project was through the memorandum referred to

above. However, Mr. Stewart and Mr. Sale did tell me in conversation that they had talked with Mr. Fischbach in New York City and that they all understood that there was to be additional financing other than the $26,250 to be advanced for the purchase of the property. As to what extent Mr. Fischbach agreed to go into additional financing, I do not know. The matter of this major financing, wherein we are one of the interests is concerned, has never been discussed at any of the meetings of the stockholders or directors that I have attended. Our interests were to put up $26,250 each on the initial payment of the land.'

" 'It was my understanding that the corporation was to execute and deliver to the contractors notes for the amounts advanced by them ($26,250 each with accrued interest at five per cent) and that such notes are to be repaid by first applying to the notes fees to be collected by the contractors for construction of the buildings contemplated.'

[Then follows the election of the directors, here omitted.]

"Thereupon, on motion duly presented and unanimously adopted, it was

"Resolved, that all the actions taken by the officers and directors of the corporation since the incorporation of the company be, and the same hereby are approved, ratified and confirmed.

"Thereupon, there being no further business to come before the meeting, upon motion duly presented and unanimously adopted, the meeting was adjourned."

To take care of current expenses, including telephone, taxes, tax service and the like, Henger and Wallace, over this period, advanced an additional $11,000 to the corporation. Sale was unable to secure a single "major" tenant for the Center. Though the anticipated Center had some 45 to 50 sites, Sale obtained only 2 executed leases, one for a filling station and another for a Cabell's Minute Market. Thus the corporation never got the loan from the major insurance company.

At the directors' meeting of February 7, 1958, at which Sale was present, Henger, who had since become president, pointed out that the corporation was losing money; that taxes, attorneys' and accountants' fees were accruing; *"that the corporation owes notes payable to its stockholders and Republic National Bank of Dallas in the total amounts of $179,332.22,"* and that the corporation owed the $500,000 balance on land purchased as the shopping center site. Henger said he had had inquiries for the sale of the land. Sale expressed the hope that he would get a major lease contract from S. S. Kresge & Company. The lease was not obtained. The corporation did get a favorable offer to sell the land. The resolution for the sale for $700,000 was adopted on October 10, 1958. The actual profit realized was approximately $95,000.

The payments or repayments were then made to Henger, Wallace, and Moore, which are the subject of this suit. Henger and Wallace, after the money was paid to them, each had advanced approximately $11,000 more to the corporation than they were paid back. The money paid for capital stock is not considered here. After Moore, Wallace, and Henger were paid or repaid, and the indebtedness to the banks was paid, the corporation had on hand $3,000. It is to be made clear that there are no outside creditors involved here. This is not a suit by creditors but a suit on behalf of the corporation by a stockholder.

There was no resolution on the minutes of the corporation authorizing the payments to Henger, Moore or Wallace.

Of controlling importance here is the question as to whether the monies advanced by Henger, Wallace, Moore and Corgan were loans and were obligations of the corporation. The defendants and their witnesses all said they were. On cross-examination, Sale said that he was "well

**340**

aware of the fact that Sam Wallace and Mr. Henger were making these advances from November 25, 1955, down to 1958"; that he "raised no objection to their lending the money to the corporation." His point was that Henger and Wallace were not to get their money back until the center was completed and the permanent financing accomplished, and that there was no corporate authority for the repayment.

The jury found that the original loans of Wallace, Henger and Moore were used to purchase the lands for the corporation from the Slaughter Estate; that all other loans from Wallace and Henger which were repaid to them were used by the corporation to meet its obligations; that all of the directors did know of the loan by Moore, but all directors [meaning Sale] did not know of the loans by Henger and Wallace; that none of the officers objected to the loans by Wallace, Henger, or Moore; that all of the directors did consent to the making of the loan by Moore, but not to the loans made by Wallace and Henger. As stated above, judgment was rendered for Moore on this verdict.

The trial court correctly disregarded the jury findings adverse to Henger and Wallace. We hold that as a matter of law, under this record, the monies advanced by them, used entirely for corporate purposes, evidenced by notes, and carried on the records of the corporation as current liabilities, were loans to the corporation and valid obligations of the corporation. Under these circumstances, the corporation could not successfully recover funds expended in repayment of its obligations. It follows that the stockholder has no greater right in a stockholder's derivative suit. 13 Fletcher Cyclopedia Corporations (Perm. ed.) §§ 5947 and 5948, pp. 430 et seq.; Levin v. Mayer, 86 Misc. 116, 149 N.Y.S. 112. We are of the opinion that intrinsic fairness to the corporation of the repayments was conclusively shown under the evidence, from which it follows that the controlling directors did not breach their fiduciary duty to the corporation either in the transactions themselves or in the fact that the transactions were not authorized by formal corporate action.

The judgment of the Court of Civil Appeals, in so far as it reversed the judgment of the trial court as to the sale of dirt of the corporation and there rendered judgment for Henger, is affirmed. In so far as the judgment of the Court of Civil Appeals reversed the cause and remanded it for a new trial on the recovery of money repaid to Henger and Wallace is concerned, it is reversed; and the judgment of the trial court is affirmed.