GEARHART INDUSTRIES, INC., et al., Plaintiffs-Appellees, Cross Appellants,

v.

SMITH INTERNATIONAL, INC., a Delaware Corporation, Defendant Third Party Plaintiff-Appellant, Cross Appellee,

v.

TEXAS AMERICAN/FORT WORTH N.A., Trustee, et al., Third Party Defendants-Appellees.

Nos. 84–1483, 84–1620.

United States Court of Appeals, Fifth Circuit.

Aug. 31, 1984.

Shank, Irwin & Conant, A.B. Conant, Jr., Ivan Irwin, Jr., Robert B. Cousins, Jr., Brett Ringle, Dallas, Tex., Hughes, Hubbard, & Reed, Norbert A. Schlei, Los Angeles, Cal., for defendant third party plaintiff-appellant, cross appellee.

Law, Snakard, Brown & Gambill, Jonathan Kerr, Robert F. Watson, Dallas, Tex., Milton R. Ackman, Alexander Sussman, New York City, Cantey, Hanger, Gooch, Minn & Collins, Robert S. Travis, Fort Worth, Tex., Fried, Frank, Harris, Shriver & Jacobson, Marc P. Cherno, New York City, for Gearhart Industries, Inc.

Chester J. Hinshaw, Hugh R. Whiting, Dallas, Tex., for intervenor AETNA.

Fredric J. Zepp, H. Steven Wilson, New York City, Edmund Glen Johnson, Wesley N. Harris, Janice A. Schattman, Fort Worth, Tex., for Texas American Fort Worth.

Jacob H. Stillman, David A. Sirignano, S.E.C., Washington, D.C., amicus curiae, for S.E.C.

Before GEE, POLITZ and RANDALL, Circuit Judges.

GEE, Circuit Judge:

On this appeal we review a preliminary injunction and various other orders entered by the district court in connection with an attempt by Appellant Smith International, Inc. (Smith) to acquire control of Appellee Gearhart Industries, Inc. (Gearhart), another company operating in the general area of oil field service. A cross-appeal by Gearhart complains of the court's refusal to sterilize voting rights in a large block of Gearhart shares purchased by Smith early in the takeover attempt from General Electric Venture Capital Corporation.

The movant must prove four prerequisites to secure a preliminary injunction: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not issued; (3) that threatened injury to the movant outweighs any damage the injunction might cause to the opponent; and (4) that the injunction will not disserve the public interest. *Apple Barrel Productions, Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir.1984). The grant or denial of a preliminary injunction by the district judge may be reversed on appeal only by a showing of abuse of discretion. *Id.* The four elements for preliminary injunctive relief are mixed questions of fact and law. *Id.* The district court's findings of fact must be upheld unless they are clearly erroneous. *Id.* Its conclusions of law, however, are subject to broad review and will be reversed if incorrect. *Id.; see also Houston Agricultural Credit Corp. v. United States*, 736 F.2d 233 at 235 (5th Cir.1984).

Whether we might have done as the trial court did is thus of no consequence; the question for us is whether the trial court exceeded the broad limits within which its power could properly be exercised, and we conclude that in some respects it did.

The situation in which the parties and the trial court are placed demands of us speed rather than art, nor—as we note above—need we engage in the sort of plenary review that an appeal of permanent relief would require. *Henry v. First Nat'l Bank,* 595 F.2d 291, 302 (5th Cir.1979). Hence, we shall be as brief as possible, consistent with explaining the reasons for our rulings. A more full exposition of the facts leading up to the tender offer will be found in the opinion of the trial court, reported at 592 F.Supp. 203 (N.D.Tex. 1984). We state them here only briefly, adding more particulars where needful in the body of our opinion.

### Factual Background

Gearhart, the target, is a Texas corporation engaged in the business of oil well evaluation. Its common stock, consisting at the time of the district court's opinion of just over sixteen million shares issued and outstanding, is listed and traded on the New York Stock Exchange and elsewhere. Smith, the would-be acquirer of control, is a Delaware corporation, admitted to do business in Texas and engaged in oil field service work there. For well over ten years, Smith and Gearhart have considered joining forces in some fashion, going so far about a year ago as to discuss specific merger ratios of Smith shares per Gearhart share. About the same time, however, Smith, with a view to acquiring Gearhart, employed an investment banker and assembled an internal acquisition team.

Shortly after this, and in connection with their merger discussions, Smith obtained permission from Gearhart to talk with General Electric Venture Capital Corporation (GE) about a block of 3,640,514 Gearhart shares it owned. Discussions of various proposals followed, including the possibility that GE might buy out both companies. In mid-October 1983, however, Smith secretly negotiated a purchase of the GE block at $31 a share. When Gearhart learned of the purchase, it expressed approval.

Smith filed a 13(d) disclosure statement just before purchasing the GE shares stating that its purpose in buying the GE block was "acquiring a significant investment" in Gearhart and that, if Gearhart's prospects appeared to justify it, "Smith may determine to increase its position in [Gearhart]." Over the course of the next half year, Smith increased its position in Gearhart by the purchase of about a half-million shares, most in two blocks totalling over 330,000 shares from Jeffries & Co., a brokerage house, at a price of $21, and some on the open market. By February 1984, Gearhart had apparently become apprehensive about Smith's activities and retained counsel and an investment banker. In addition, it began to discuss these activities with Smith, seeking to obtain a standstill agreement or otherwise to deflect Smith's apparent acquisition project. Smith was not cooperative.

By early April, Gearhart rightly concluded that Smith had thrown down the gauntlet. The tempo picked up: in the first week of that month Smith bought over a quarter-million Gearhart shares on the open market at prices between $25 and $27 per share. By April 10, when it filed an amended 13(d) disclosure statement owning up at last to a purpose to continue its acquisition program "by tender offer or otherwise," it had obtained a 26.5 percent position in Gearhart. Two days later, Smith made a firm offer to purchase a block of well over a million shares of Gearhart from Kemper Financial Services, Inc. The transaction was consummated on April 16, at a time when—as the trial court concluded—an oral standstill agreement was in effect between Smith and Gearhart. With this, Smith had acquired over one third of Gearhart's outstanding common stock. Gearhart brought suit on April 18 in both state and federal court seeking to abort the Smith charge.

That same day, the Gearhart board authorized the issuance and sale of a large amount of subordinated debentures and accompanying warrants. Nine days later, Gearhart sold $98,700,000 of the debentures at a discount, grossing about $73,-000,000. The accompanying warrants allowed purchase of 2,961,000 shares of Gearhart stock and contained an unusual feature, a provision for reduction of the stock purchase price should certain "triggering events" occur. For its part, on April 27 Smith announced its partial tender offer, a triggering event, for Gearhart stock and, after the district court declined Gearhart's request to enjoin it, made the offer on April 30: $31 a share for 3,700,000 shares, enough to give Smith control at the then existing level of issued stock, but leaving a major percentage of stock outstanding in the hands of what would then be minority stockholders of Gearhart.

Thereafter the trial court held an extended evidentiary hearing in connection with Gearhart's request that the tender offer be halted for claimed violations of both state and federal law by Smith and on Smith's counterclaim and third-party claim by which it sought an injunction against the holders of the recently-issued debentures and warrants forbidding disposition of the debentures or exercise of the warrants. On June 5, the court filed its memorandum opinion and order enjoining the tender offer on the basis of violations of Sections 13(d) and 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78m(d)(1) and 78n(e), as amended by the Williams Act, as well as of Smith's breach of a standby agreement that it found the parties had entered into under state law. In addition, it upheld the warrants and debentures transaction as permissible under the business judgment rule and declined to interfere in it by injunction. Smith quickly appealed the decision.

More action was to come. After negotiations with Aetna Life and Casualty Company while the parties were awaiting oral argument of Smith's appeal, Gearhart purchased complete ownership of Aetna's Geosource investment, a seismograph concern carried on the Aetna books at a value of $450 million. In exchange, Aetna received 10,000,000 shares of Gearhart common stock, which it agreed to vote as recommended by a majority of Gearhart's directors, and other consideration. After a hearing held on July 6 at Smith's behest, the trial court set the annual meeting of Gearhart's shareholders for August 20, 1984, declined to enjoin Gearhart from proceeding further with the Geosource acquisition, but found that "equity and fairness dictate that the shares of [Gearhart] stock issued or to be issued pursuant to the Aetna [Geosource] transaction should not be permitted to be voted in the upcoming shareholders meeting" nor in determining a quorum there.

We heard appeals from the above actions of the trial court on July 19, entering in connection with that hearing a comprehensive order designed to halt all further extraordinary transactions by any party to the case pending our consideration and disposition of the appeal. A later order reset the Gearhart shareholders' meeting for October 1, 1984.

## Bases of the Injunction
### Section 13(d)

■ This section of the Securities Exchange Act requires, in pertinent part, that any person who acquires more than five percent beneficial ownership of a registered equity security of such an entity as Gearhart shall, within ten days after the acquisition, furnish the issuer of the security, the exchange where the security is traded, and the SEC certain information, including:

if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure; ....

15 U.S.C. § 78m(d)(1)(C). Amendments to reflect material changes in the information furnished are likewise required. The purpose of the Williams Act, of which Sections 13(d), 15 U.S.C. § 78m(d)(1), and 14(e), 15 U.S.C. § 78n(e), are a part, is not to tip the scales in favor of management or its opponents but to insure that a public shareholder, confronted by a cash tender for his stock, can obtain adequate information about the qualifications and intentions of the offering party before responding to the offer. *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 31, 97 S.Ct. 926, 944, 51 L.Ed.2d 124 (1977); *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975).[1]

On the basis of ample evidence, the trial court found that between the autumn of 1983 and the spring of 1984 Smith concealed its intent to acquire control of Gearhart by filing a 13(d) disclosure statement and amendments to it that failed to reflect that intent, stating rather that it wished to acquire the Gearhart stock for "investment." More specifically, the court determined that from October 31, 1983, when Smith filed its initial 13(d) disclosure of purchase of approximately 23 percent of Gearhart's outstanding shares from General Electric, until April 10, when it disclosed a 26.5 percent interest and its purpose to seek control, Smith had already formed and maintained such a purpose. The court found that by so doing Smith had avoided the rise in stock price that such a disclosure would have produced, had denied Gearhart shareholders knowledge to which the Williams Act entitled them, and had illegally obtained a "blocking position" of about one-third ownership in Gearhart—one that rendered resistance by Gearhart to its advances more difficult. So finding, the court enjoined Smith from carrying out a partial tender offer that Smith had made on April 20, 1984, one that would, if successful, have given Smith control of Gearhart.

### Section 14(e)

As an alternative basis for the injunction, the trial court concluded that in its tender

---

1. Although not joined by a majority of the Court, which was fragmented, Justice White's discussion of the Williams Act, its purposes and the Court's authorities treating of it in *Edgar v. Mite Corporation*, 457 U.S. 624, 633–4, 102 S.Ct. 2629, 2636, 73 L.Ed.2d 269 (1982), is instructive:

   There is no question that in imposing these requirements, Congress intended to protect investors. *Piper v. Chris-Craft Industries, Inc., supra* [430 U.S. 1] at 35, 51 L.Ed.2d 124, 97 S.Ct. 926 [at 946]; *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 45 L.Ed.2d 12, 95 S.Ct. 2069 [2075] (1975); S.Rep. No. 550, 90th Cong, 1st Sess, 3–4 (1967) (Senate Report). But it is also crystal clear that a major aspect of the effort to protect the investor was to avoid favoring either management or the takeover bidder. As we noted in *Piper,* the disclosure provisions originally embodied in S. 2731 "were avowedly pro-management in the target company's efforts to defeat takeover bids." 430 U.S. [1] at 30, 51 L.Ed.2d 124, 97 S.Ct. 926 [at 943]. But Congress became convinced "that takeover bids should not be discouraged because they serve a useful purpose in providing a check on entrenched but inefficient management." Senate Report, at 3.[9] It also became apparent that entrenched management was often successful in defeating takeover attempts. As the legislation evolved, therefore, Congress disclaimed any "intention to provide a weapon for management to discourage takeover bids," *Rondeau v. Mosinee Paper Corp., supra* [422 U.S. 49] at 58, 45 L.Ed.2d 12, 95 S.Ct. 2069 [at 2076], and expressly embraced a policy of neutrality. As Senator Williams explained: "We have taken extreme care to avoid tipping the scales either in favor of management or in favor of the person making the takeover bids." 113 Cong. Rec. 24664 (1967). This policy of "evenhandedness," *Piper v. Chris-Craft Industries, Inc., supra,* [430 U.S. 1] at 31, 51 L.Ed.2d 124, 97 S.Ct. 926 [at 944], represented a conviction that neither side in the contest should be extended additional advantages vis-a-vis the investor, who if furnished with adequate information would be in a position to make his own informed choice. We, therefore, agree with the Court of Appeals that Congress sought to protect the investor not only by furnishing him with the necessary information but also by withholding from management or the bidder any undue advantage that could frustrate the exercise of an informed choice.

   [9] Congress also did not want to deny shareholders "the opportunities which result from the competitive bidding for a block of stock of a given company," namely, the opportunity to sell shares for a premium over their market price. 113 Cong.Rec. 24666 (1967) (remarks of Sen. Javits).

offer materials given to Gearhart's shareholders Smith failed to disclose sufficient information regarding Smith's potential liability in a California patent suit, all in violation of Section 14(e), 15 U.S.C. § 78n(e). The basis of the court's conclusion is a statement by Smith in these materials that Smith believes it has "meritorious defenses" to the suit, when in fact it has already admitted patent infringement in the case and only damages—potentially serious ones—remain in contention. Thus, the court concluded, the tender materials presented a misleading picture of Smith's financial condition to Gearhart's shareholders considering its tender offer.

*State Law Claim*

As a final basis for the injunction, the court was "inclined to believe" that an oral standstill agreement was made by Smith to cease all buying in exchange for Gearhart's promise to stop shopping the company and was breached during its brief term by Smith's purchase of more than one million shares of Gearhart from Kemper Financial Services, Inc. (the Kemper block) on April 16, 1984. Other language in the court's opinion, however, suggests that despite its tentative language the court intended the breach of agreement to furnish a basis for its preliminary injunction and that it made credibility choices between witnesses' testimony favoring the existence and breach of such an understanding.

*Injunctive Overkill*

■ Much might be (and has been) written on the question whether even a private right of action, let alone a right to injunctive relief, is available in such a suit as this: one by a private party asserting a violation of Section 13(d) or 14(e). Indeed, a divided panel of our sister circuit has recently concluded that it is not under either. *Liberty National Insurance Holding Co. v. Charter Co.*, 734 F.2d 545 (11th Cir.1984) (Vance, J., dissenting). Although the point

is not strenuously briefed by the parties, it is raised and, since it lies in our path, must be dealt with. For several reasons, we conclude that such a right does exist and that equitable relief is available.

First, relevant opinions of the Supreme Court assume or imply that it is, although they do not squarely say so. *Piper, supra; Rondeau, supra.* Second, there are cases from other circuits that hold squarely that a target corporation has standing to assert a private cause of action for injunctive relief for violations of Section 13(d). *Indiana Nat. Corp. v. Rich,* 712 F.2d 1180 (7th Cir.1983); *Dan River, Inc. v. Unitex Ltd.,* 624 F.2d 1216 (4th Cir.1980), *cert. denied,* 449 U.S. 1101, 101 S.Ct. 896, 66 L.Ed.2d 827 (1981); *GAF Corp. v. Milstein,* 453 F.2d 709 (2d Cir.1971) *cert. denied* 406 U.S. 910 (1972).[2]

Our own Circuit has held that enforcement through a private action under Section 14(e) is available to a shareholder injured by the fraudulent activities of others perpetrated in connection with a tender offer. *Smallwood v. Pearl Brewing Company,* 489 F.2d 579, 596 (5th Cir.1974). Other circuits have extended this private right of action under 14(e) to include injunctive relief. *Pacific Realty Trust v. APC Investments, Inc.,* 685 F.2d 1083, 1085 (9th Cir. 1982); *Prudent Real Estate Trust v. Johncamp Realty, Inc.,* 599 F.2d 1140, 1148–49 (2d Cir.1979). Additionally, we are persuaded by the reasoning of our Brother Higginbotham, then sitting on the district bench, in two careful opinions upholding a private right of action for 14(e) violations. *In re Commonwealth Oil/Tesoro Petroleum Corp. Securities Litigation,* 467 F.Supp. 227, 241–43 (W.D.Tex.1979); *Hundahl v. United Benefit Life Ins. Co.,* 465 F.Supp. 1349, 1366–68 (N.D.Tex.1979). Finally, to conclude that such relief is available in no circumstances whatever—however flagrant—would be all but to license the filing of deliberately misleading 13(d)

---

**2.** Two other cases are frequently cited for this proposition: *Chromalloy American Corp. v. Sun Chemical Corp.,* 611 F.2d 240 (8th Cir.1979), and *General Aircraft Corp. v. Lampert,* 556 F.2d 90 (1st Cir.1977). In neither of these cases was the availability of a private right of action to an issuer for violations of section 13(d) directly at issue. *Chromalloy,* 611 F.2d at 249 n. 18; *General Aircraft,* 556 F.2d at 94 n. 5.

and 14(e) disclosure statements on pain of nothing more than a possible damage suit by sellers or intervention by the SEC—a body that assures us on amicus brief that its resources are inadequate to police the myriad 13(d) filings made each year so as to insure truthful disclosures.

█ Even so, injunctive relief is drastic medicine indeed. As is familiar law, it should be carefully tailored to the situation presented and should be no broader than necessary to accomplish the purpose of the court in granting it. We conclude that the preliminary injunction granted here by the trial court is not justified by two of the bases offered in support of it and is broader than necessary to accomplish the needs of the third.

We see little if any connection between the breach of the standstill agreement and the tender offer, or how that breach can serve as a basis for enjoining the tender. To be sure, by going forward with its purchase of the Kemper block of shares at a time when it had agreed with Gearhart to halt further stock purchases, Smith strengthened its position vis-a-vis Gearhart management; but it is not the purpose of the Williams Act to prevent such actions, undesirable as the breach of an agreement may be. As the Supreme Court emphasized in *Piper v. Chris-Craft Industries, Inc.*, quoting a statement of the sponsor of the Williams Act from the Congressional Record, *"[The Bill] is designed solely to require full and fair disclosure for the benefit of investors."* 430 U.S. at 31, 97 S.Ct. at 944. The purchase of the Kemper block had no effect to mislead investors, hence the Williams Act furnishes no basis for enjoining the tender offer on the basis of it. Whatever remedy might be appropriate for breach of the standstill agreement, this one is not.

Nor do we perceive that the injunction is necessary to deal with the creeping control problem posed by the misleading 13(d) filings. Only about a half-million shares were acquired by Smith under cover of these filings, over three hundred thirty thousand of these from Jeffries & Co., a brokerage house specializing in such blocks of shares. The *sole* purpose of the Williams Act is full and fair disclosure to investors, and in crafting that Act Congress was at extreme pains to avoid "tipping the scales either in favor of management or in favor of the person making the takeover bids." *Piper*, 430 U.S. at 31, 97 S.Ct. at 944. Insofar, then, as the injunction is made to rest on disadvantage created to Gearhart management's resistance to the takeover, the Williams Act does not support it. Smith argues that its April 10 amended Schedule 13D disclosing its intent to acquire control of Gearhart cured any previous violation of Section 13(d), at least so as to preclude injunctive relief. We agree. The reasoning of the Second Circuit in *Treadway Companies, Inc. v. Care Corp.* is convincing:

> The goal of § 13(d) "is to alert the marketplace to every large, rapid aggregation or accumulation of securities ... which might represent a potential shift in corporate control." *GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir.1971), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972). But as the Supreme Court noted in *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58, 95 S.Ct. 2069, 2076, 45 L.Ed.2d 12 (1975). "Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts." *See* S.Rep. No. 550, 90th Cong., 1st Sess., 3 (1967); H.R.Rep. No. 1711, 90th Cong., 2d Sess., 4 (1967). Thus, an injunction will issue for a violation of § 13(d) only on a showing of irreparable harm to the interests which that section seeks to protect. *Rondeau v. Mosinee Paper Corp., supra.* Those interests are fully satisfied when the shareholders receive the information required to be filed. *See General Aircraft Corp. v. Lampert*, 556 F.2d 90, 97 (1st Cir.1977).

*Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357, 380 (2d Cir.1980).

As for the interests of shareholders who may have sold their Gearhart stock under a misapprehension created by the false 13(d) statements, we conclude that enjoining the tender offer is an inappropriate and over-drastic course of action. Damages are available to them as a remedy, and we fail to see how the injunction entered advances their interests in any significant manner. *Standard Metals Corp. v. Tomlin* [1981 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,894 (S.D.N.Y.1981). To be sure, it is imaginable that some of these persons sold only part of their Gearhart holdings and therefore retain an interest in Gearhart's destiny, but the trial judge made no such finding and, even had he done so, it would be a slim reed to support such drastic and sweeping relief.

■ There remains the matter of the 14(e) violation, the statement by Smith in its tender materials that it believed it had "meritorious defenses" to a patent suit in which only the quantum of damages remained at issue. To be sure, it may be open to question whether this single, inartful statement rises to such egregious proportions as to justify shutting down the entire tender offer. The potential liability is uncertain, however, and should it be severe the consequences for Smith could be disastrous. We therefore defer to the trial court's finding that the want of disclosure was of a serious nature, likely to mislead a reasonable shareholder in deciding whether to tender his shares. *T.S.C. Industries v. Northway*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Surely, however, the proper remedy was an order that full disclosure be made, combined with an injunction extending only until a proper disclosure was made and perhaps shortly thereafter. *Dan River, Inc. v. Icahn*, 701 F.2d 278, 286 (4th Cir.1983). We therefore modify the court's injunction to provide that it shall extend only until Smith makes a 14(e) disclosure that the trial court approves regarding the status of the patent litigation and such number of days thereafter as the trial court shall conclude are required in order to permit holders of Gear-

hart shares to learn of the disclosure and evaluate it.

### Gearhart's By-law Changes

Smith also complains to us of various by-law changes instituted by Gearhart's board, intended, in Smith's view, as defensive measures against a hostile takeover. It is doubtful that these complaints were pressed before the trial court, which made no ruling upon them. But even if they were and hence are properly before us, we discern little necessity to pass upon them at this time. Smith's chief complaint is that the amended by-laws grant the board power to fix the date of the annual shareholders' meeting at which directors are elected. As the district court and this Court are now in control of when the 1984 meeting will be held, it is beyond the power of the directors to postpone it to Smith's disadvantage. Another complaint relates to the numbers of shares (two-thirds) required to amend the by-laws so as to permit the election of new directors at a special meeting. The regular, annual meeting is impending, however, at which it is apparent that the question of who the directors are to be will be resolved. No special meeting could likely be held before that annual meeting, nor is it seriously suggested that any is likely to be. In these circumstances, there seems little occasion for us to consider these complaints on an emergency basis in this expedited appeal, since they are all but sure to be mooted by events at the forthcoming annual meeting—to which the new by-laws complained of do not apply.

### Gearhart's Cross-Appeal

■ Gearhart complains on cross-appeal of the refusal of the trial court to sterilize Smith's voting rights in the original block of shares that it purchased from GE after filing its misleading 13(d) statement, citing cases such as *Twin Fair, Inc. v. Reger*, 394 F.Supp. 156 (W.D.N.Y.1975), in which such action was taken. Smith responds that GE's sale of the block was not influenced by any disclosure or non-disclosure under

Section 13(d). *Polinsky v. MCA, Inc.*, 680 F.2d 1286, 1289–90 (9th Cir.1982).

For reasons stated earlier in our opinion, we decline to reverse this decision of the trial court. As we there noted, the Williams Act exists for the protection of shareholders, not that of corporate management. As Chief Justice Burger wrote in *Rondeau:*

The Court of Appeals' conclusion that respondent suffered "harm" sufficient to require sterilization of petitioner's stock need not long detain us. The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party. By requiring disclosure of information to the target corporation as well as the Securities and Exchange Commission, Congress intended to do no more than give incumbent management an opportunity to express and explain its position. The Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids or prevent large accumulations of stock which would create the potential for such attempts. Indeed, the Act's draftsmen commented upon the "extreme care" which was taken "to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid." S.Rep. No. 550, 90th Cong, 1st Sess, 3 (1967); HR Rep. No. 1711, 90th Cong, 2d Sess, 4 (1968). See also *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 947 (CA2 1969) ....

Nor are we impressed by respondent's argument that an injunction is necessary to protect the interests of its shareholders who either sold their stock to petitioner at predisclosure prices or would not have invested had they known that a takeover bid was imminent.... As observed, the principal object of the Williams Act is to solve the dilemma of shareholders desiring to respond to a cash tender offer, and it is not at all clear that the type of "harm" identified by respondent is redressable under its provisions. In any event, those persons who allegedly sold at an unfairly depressed price have an adequate remedy by way of an action for damages, thus negating the basis for equitable relief.

*Rondeau*, 422 U.S. 58–60, 95 S.Ct. at 2075–2076 (1975) (footnotes omitted). The decision goes on to state that injunctive relief is not justified by the bare fact that a violation of the Williams Act has occurred. *Id.*, 422 U.S. at 60, 95 S.Ct. at 2076. According to the *Rondeau* majority, the party seeking injunctive relief for a violation of Section 13(d) must satisfy the traditional prerequisite of extraordinary equitable relief by establishing irreparable harm. *Id.*, 422 U.S. at 61, 95 S.Ct. at 2077.

Although the district court's opinion of June 5 did not discuss Gearhart's request to sterilize Smith's voting rights in the shares purchased from GE, we perceive no abuse of discretion in its implicit denial of the sterilization remedy. The evidence before the district court does not convince us of any harm whatever that the other Gearhart shareholders will suffer if the GE shares are voted. At most, their votes, combined with others, might produce a majority delivering control of Gearhart to Smith; and while we are sensible that Gearhart would view such an outcome as catastrophic, nothing in the record persuades us to such a view.

Certainly General Electric was not injured in any manner by its sale to Smith at the generous price of $31 a share, and we have already determined that the misleading 13(d) filings just before the GE sale was consummated pursuant to an agreement made *before* the filing do not support such drastic relief as enjoining the tender offer. We find it difficult to believe that GE would not have sold its Gearhart shares if Smith had filed a Schedule 13D disclosing its intent to gain control of Gearhart. This being so, we cannot find the trial court's refusal to sterilize voting rights in these shares an abuse of its discretion because Smith did not meet its burden of establishing irreparable harm. Doing so,

indeed, might smack of that very "tilting" that the Williams Act seeks to avoid, whereby the court, rather than market forces and the combatting parties, determines the outcome of the struggle for corporate control.

### Debentures and Warrants

Smith filed a counterclaim in the district court, along with a third party claim under §§ 14(d) and 14(e) of the Securities and Exchange Act, and § 78n(e) and Rules 14d–9 and 14e–2 promulgated by the SEC. These claims by Smith center around certain debentures and warrants issued by Gearhart on April 27, 1984.

As we have noted, upon learning of Smith's acquisition of the Kemper block of shares, Gearhart sued both in state and federal court on April 18, 1984, seeking to halt Smith's creeping attempt to gain control of the company. That same day, Gearhart's board of directors met with representatives of Drexel Burnham Lambert, Inc. to discuss various means of halting Smith's efforts to achieve dominance over the corporation. As a result of this conference with its financial advisors, the board authorized corporate management to consummate a debenture offering. Negotiations with several institutional investors took place, concluding on April 24. On the morning of Friday, April 27, the debentures/warrants transaction closed in California. Hours or perhaps only minutes later, Smith announced its tender offer, although the formal tender offer was not made until the following Monday, April 30. The Gearhart board of directors ratified the debentures/warrants transaction on May 3.

These securities were sold to ten financial institutions (the third-party defendants in this law suit) through Drexel Burnham. The face amount of the debentures was $98,700,000, although the purchasers paid only $73,000,000 for them. They mature in ten years and bear interest on outstanding principal at a stated rate of 8⅝% per annum, with a yield to maturity of approximately 14⅞% because the debentures were discounted. The warrants authorize the purchase of 2,961,000 shares of newly issued common stock upon their exercise. They are exercisable for a five-year period at an exercise price of $33 per share, unless a "triggering event" occurs. Several occurrences qualify as triggering events— among them a tender offer not recommended by the Gearhart board which would result in the offeror becoming the holder of more than 5,400,000 Gearhart shares. The warrants' exercise price drops to $24.60 per share when a triggering event takes place. Smith's tender offer clearly qualifies as a triggering event, as Gearhart doubtless meant it to do. The parties refer to this arrangement as the "springing" feature of the warrants.

Smith contends that the "springing" feature of the warrants is a violation of Gearhart management's fiduciary duty to its shareholders because the debentures and warrants were issued primarily to retain incumbent management's control over the company, citing *Schilling v. Belcher*, 582 F.2d 995, 1004–05 (5th Cir.1979).[3] Asserting that corporate officers and directors owe fiduciary duties to their shareholders, Smith argues that injunctive relief is available against attempted consolidation of management control by management's actions having the effect of devaluing the shareholder's interests, citing *Patton v. Nicholas*, 154 Tex. 385, 279 S.W.2d 848, 853 (1955). Smith's brief then cites several cases from other jurisdictions, none of which is binding on us, to support its argument that courts consistently have condemned defensive conduct of target corporations, like that of Gearhart in issuing the debentures and warrants, which damages shareholders' interests in order to defeat a tender offer. The offeror has directed us to no case decided under Texas law to

---

**3.** *Schilling* was decided under Florida law and involved a corporation's purchase of its own shares at an inflated price of at least $76.70 per share over market value, almost double that value. On both the law and the facts, the case is too distinguishable from today's case to be persuasive.

support this proposition, however, and our research has revealed none. Smith's final argument relative to the Gearhart officers' and directors' alleged breach of their fiduciary duties is that Gearhart's "business judgment rule" defense is irrelevant to the "springing" feature of the warrants because directors cannot exercise their business judgment when an outside event, the "triggering event," can automatically reduce the purchase price of the stock to be sold.

■ The issues enumerated in the previous paragraph all revolve around the fiduciary duties of corporate officers and directors. These obligations are creatures of state common law, *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 549, 69 S.Ct. 1221, 1227, 93 L.Ed. 1528 (1949); see also *Clark v. Lomas & Nettleton Financial Corp.*, 625 F.2d 49, 52 n. 3 (5th Cir.1980). A recitation of some general principles of Texas corporate law is, therefore, in order before we analyze Smith's specific allegations.[4]

Because the fiduciary obligations of corporate officers are often identical to those of directors, Ubelaker, *Director Liability Under the Business Judgment Rule*, 35 Sw.L.J. 775, 775 n. 1 (1981) [hereinafter cited as Ubelaker],[5] and because all of the individual Gearhart plaintiffs are directors,[6] we will address only the legal relationship of the Gearhart directors to their corporation.

■ Three broad duties stem from the fiduciary status of corporate directors; namely, the duties of obedience, loyalty,

and due care. Ubelaker at 781–82. The duty of obedience requires a director to avoid committing ultra vires acts, i.e., acts beyond the scope of the powers of a corporation as defined by its charter or the laws of the state of incorporation. Ubelaker at 782. An ultra vires act, negligent or not, may be voidable under Texas law, but the director is not personally liable for it unless the action in question is also illegal. *Staacke v. Routledge*, 111 Tex. 489, 241 S.W. 994 (1922); *Sutton v. Reagan & Gee*, 405 S.W.2d 828 (Tex.Civ.App.—San Antonio 1966, *writ ref'd n.r.e.*); *see also* Tex.Bus. Corp.Act Ann. art. 2.04 (Vernon 1980). An illegal act in this context is one in violation of a specific statute, malum in se, malum prohibitum, or against public policy. *Staacke v. Routledge*, 241 S.W. at 998–99.

■ The duty of loyalty dictates that a director must act in good faith and must not allow his personal interests to prevail over the interests of the corporation. Whether a director is "interested" is a question of fact. *International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex.1963). A director is considered "interested" if he or she (1) makes a personal profit from a transaction by dealing with the corporation or usurps a corporate opportunity, *id.* at 577; (2) buys or sells assets of the corporation, *Niagara Fire Ins. Co. v. Numismatic Co.*, 380 S.W.2d 830 (Tex.Civ.App.—Fort Worth 1964, *writ ref'd n.r.e.*); *Brooks v. Zorn*, 24 S.W.2d 742 (Tex.Civ.App.—Beaumont 1929, *writ dism'd*); *Allen v. Hutcheson*, 57 Tex.Civ. App. 71, 121 S.W. 1141 (1909, *writ ref'd*); (3) transacts business in his director's ca-

---

**4.** We are both surprised and inconvenienced by the circumstance that, despite their multitudinous and voluminous briefs and exhibits, neither plaintiffs nor defendants seriously attempt to analyze officers' and directors' fiduciary duties or the business judgment rule under *Texas* law. This is particularly so in view of the authorities cited in their discussions of the business judgment rule: Smith and Gearhart argue back and forth over the applicability of the plethora of out-of-state cases they cite, yet they ignore the fact that we are obligated to decide these aspects of this case under Texas law. We note that two cases cited to us as purported Texas authority were both decided under Dela-

ware law, i.e., *Maher v. Zapata Corp.*, 490 F.Supp. 348 (S.D.Tex.1980), and *Pogo Producing Co. v. Northwest Industries, Inc.*, No. H–83–2667 (S.D.Tex. May 24, 1983).

**5.** The Court is indebted to the author of this excellent article for her thorough treatment of the duties of corporate fiduciaries and the business judgment rule, and particularly for the depth of her research into Texas law on these topics.

**6.** Marvin Gearhart is the only director who is also an officer.

pacity with a second corporation of which he is also a director or significantly financially associated, *Reynold's-Southwestern Corp. v. Dresser Industries, Inc.,* 438 S.W.2d 135 (Tex.Civ.App.—Houston [14th Dist.] 1969, *writ ref'd n.r.e.*); or (4) transacts business in his director's capacity with a family member. *Davis v. Nueces Valley Irrigation Co.,* 103 Tex. 243, 126 S.W. 4 (1910).

Transactions involving an interested director are subject to strict judicial scrutiny but are not voidable unless they are shown to be unfair to the corporation. *Pepper v. Litton,* 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939); *International Bankers Life Ins. Co. v. Holloway, supra; Henger v. Sale,* 365 S.W.2d 335 (Tex.1963); *Popperman v. Rest Haven Cemetery, Inc.,* 162 Tex. 255, 345 S.W.2d 715 (1961); *Western Inn Corp. v. Heyl,* 452 S.W.2d 752 (Tex.Civ.App.—Fort Worth 1970, *writ ref'd n.r.e.*); *Wiberg v. Gulf Coast Land & Dev. Co.,* 360 S.W.2d 563 (Tex.Civ.App.—Beaumont 1962, *writ ref'd n.r.e.*). If the director is found to have committed fraud, over-reaching, or waste of corporate assets, the transaction will be set aside. *Allen v. Wilkerson,* 396 S.W.2d 493 (Tex.Civ.App.—Austin 1965, *writ ref'd n.r.e.*); *Mercury Life & Health Co. v. Hughes,* 271 S.W.2d 842 (Tex.Civ.App.—San Antonio 1954, *writ ref'd*); *Duncan v. Ponton,* 102 S.W.2d 517 (Tex.Civ.App.—Fort Worth 1937, *no writ*); *Allen v. Hutcheson, supra.* In all other circumstances, the burden of proof is on the interested director to show that the action under fire is fair to the corporation. *Popperman,* 162 Tex. at 255, 345 S.W.2d at 715. A challenged transaction found to be unfair to the corporate enterprise may nonetheless be upheld if ratified by a majority of disinterested directors or the majority of the stockholders. *International Bankers Life Ins. Co. v. Holloway, supra; Tenison v. Patton,* 95 Tex. 284, 67 S.W. 92 (1902); *Wiberg v. Gulf Coast Land & Dev. Co., supra.* An interested director who is also a shareholder is entitled to vote his shares to ratify his challenged act. *Wiberg v. Gulf Coast Land & Dev. Co., supra.*

In Texas, a director is permitted to profit personally from an interested transaction, but his profit must be incidental to the promotion of corporate interests. *International Bankers Life Ins. Co. v. Holloway, supra. International Bankers* also imposes a duty of good faith owed to the corporation, that a Texas director act with an intent to confer benefit on the corporation. *International Bankers,* 368 S.W.2d at 578.

Under the law of most jurisdictions, the duty of care requires a director to be diligent and prudent in managing the corporation's affairs. Ubelaker at 784. The leading case in Texas defining a director's standard of care is *McCollum v. Dollar,* 213 S.W. 259 (Tex.Comm'n App. 1919, holding approved). That case held that a director must handle his corporate duties with such care as "an ordinarily prudent man would use under similar circumstances." *Id.* at 261. The question of director negligence is a question of fact and must be decided on a case-by-case basis. *Id.* Texas courts hold directors liable for negligent mismanagement of their corporations, but the decisions do not specifically refer to such acts as violations of the duty of care, preferring to speak in general terms of directors as fiduciaries. *International Bankers Life Ins. Co. v. Holloway, supra; Tenison v. Patton, supra; Dowdle v. Texas Am. Oil Corp.,* 503 S.W.2d 647, 651 (Tex.Civ.App.—El Paso 1973, no writ); *Fagan v. La Gloria Oil & Gas Co.,* 494 S.W.2d 624, 628 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ); *Sutton v. Reagan & Gee,* 405 S.W.2d 828, 834 (Tex.Civ.App.—San Antonio 1966, writ ref'd n.r.e.). Unquestionably, under Texas law, a director as a fiduciary must exercise his unbiased or honest business judgment in pursuit of corporate interests. *In re Westec Corp.,* 434 F.2d 195, 202 (5th Cir.1970); *International Bankers Life Ins. Co. v. Holloway, supra·* at 577. "The modern view definitely stresses the duty of loyalty

and avoids specific discussion of the parameters of due care." [7] Ubelaker at 789.

█ In other jurisdictions, a corporate director who acts in good faith and without corrupt motive will not be held liable for mistakes of business judgment that damage corporate interests. Ubelaker at 775; *see, e.g., Lasker v. Burks,* 404 F.Supp. 1172 (S.D.N.Y.1975). This principle is known as the business judgment rule and it is a defense to accusations of breach of the duty of care. Ubelaker at 775, 790. Few Texas cases discuss the issues of a director's standard of care, negligent mismanagement, and business judgment. An early case, *Cates v. Sparkman,* 73 Tex. 619, 11 S.W. 846 (1889), set the standard for judicial intervention in cases involving these issues:

> [I]f the acts or things are or may be that which the majority of the company have a right to do, or if they have been done irregularly, negligently, or imprudently, or are within the exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved, these would not constitute such a breach of duty, however unwise or inexpedient such acts might be, as would authorize interference by the courts at the suit of a shareholder.

*Id.* at 622, 11 S.W. at 849. Even though *Cates* was decided in 1889, and despite the ordinary care standard announced in *McCollum v. Dollar, supra,* Texas courts to this day will not impose liability upon a noninterested corporate director unless the challenged action is ultra vires or is tainted by fraud. See *Robinson v. Bradley,* 141 S.W.2d 425 (Tex.Civ.App.—Dallas 1940, *no writ*); *Bounds v. Stephenson,* 187 S.W.

1031 (Tex.Civ.App.—Dallas 1916, *writ ref.*); *Caffall v. Bandera Tel. Co.,* 136 S.W. 105 (Tex.Civ.App.1911); *Farwell v. Babcock,* 27 Tex.Civ.App. 162, 65 S.W. 509 (Tex.Civ.App.1901); see also *Zauber v. Murray Sav. Ass'n,* 591 S.W.2d 932 (Tex. Civ.App.—Dallas 1979, *writ ref'd n.r.e.*). Such is the business judgment rule in Texas.

█ Before turning to the specific points raised by Smith, we note that Smith lacks standing at this time to assert claims against Gearhart's directors for breaches of their fiduciary obligations. This is so because such allegations may be advanced only in a shareholder's derivative suit. *Bounds v. Stephenson,* 187 S.W. 1031 (Tex.Civ.App.—Dallas 1916, *writ ref.*); *Farwell v. Babcock, supra; Tenison v. Patton, supra; Cates v. Sparkman, supra.* The reason behind this requirement is that the directors' duties of loyalty and care run to the corporation, not to individual shareholders or even to a majority of the shareholders. *See generally* 15 Tex.Jur.3d *Corporations* §§ 165–171 (1981). Accordingly, a cause of action for breach of directors' fiduciary duties belongs to the corporation and cannot be brought by a stockholder in his own right, nor can the shareholder directly prosecute the suit in the name of the corporation.[8] *United States v. Palmer,* 578 F.2d 144, 145–46 (5th Cir.1978) (per curiam); *Com. of Mass. v. Davis,* 140 Tex. 398, 168 S.W.2d 216, *cert. denied,* 320 U.S. 210, 63 S.Ct. 1447, 87 L.Ed. 1848 (1943); *Cullum v. General Motors Acceptance Corp.,* 115 S.W.2d 1196, 1200–01 (Tex. Civ.App.—Amarillo 1938); *Paramount Famous Lasky Corp. v. Stinnett,* 17 S.W.2d 125 (Tex.Civ.App.—Waco 1929), *aff'd*

---

**7.** Under certain circumstances, liability for lack of due care may be imposed upon directors by a Texas statute. Tex.Bus.Corp.Act Ann. art. 2.41 (Vernon 1980). Under art. 2.41, a director is not accountable for violation of his duties to the corporation if he relied on the financial or legal expertise of officers, accountants, or attorneys.

**8.** There is an exception to this rule. Article 2.04(B)(1) of the Texas Business Corporation Act permits a shareholder to sue the corporation for an ultra vires act. *Patton v. Nicholas,* 154

Tex. 385, 279 S.W.2d 848, 853 (1955), cited by Smith, is another exception to this rule. When a minority of the shareholders seeks the appointment of a receiver to administer the affairs of the corporation, the courts have granted the appointment upon a clear showing of the imperative necessity of a receiver to protect the interests of the minority. *Id.* 279 S.W.2d at 852–857; *Falfurrias Immigration Co. v. Spielhagen,* 61 Tex.Civ.App. 111, 129 S.W. 164 (1910). *See* 15 Tex.Jur.3d § 172 (1981).

(Com.), 37 S.W.2d 145 (Tex.1931). Because Smith has not followed the requirements of article 5.14 of the Texas Business Corporation Act, which enumerates the prerequisites to bringing a stockholders' derivative suit, Smith has no standing to complain of alleged infringement of fiduciary obligations by Gearhart's directors. *Zauber v. Murray Sav. Ass'n.*, 591 S.W.2d 932, 935–36 (Tex.Civ.App.—Dallas 1980).

■ Despite Smith's lack of standing, we choose to address the merits of its claim that fiduciary duties have been breached because of the possibility that Smith may amend its pleadings to comply with article 5.14 of the Texas Business Corporation Act and bring a derivative action. More important, such a breach opens the way to setting aside the transaction in question. To prevail in such an action, assuming that Smith eventually brings a proper derivative suit, Smith must show that Gearhart's issuance of the debentures and warrants was a breach of the directors' duties of obedience, loyalty or care.

Smith implies a dereliction of the duty of loyalty by accusing the directors of issuing the debentures and warrants solely to entrench themselves on the board, thus making them interested directors. Let us assume, for the sake of argument, that Smith has made its case to show that the Gearhart directors are interested, establishing a breach of the duty of loyalty. The burden then shifts to the Gearhart directors to show that the transaction is fair to the corporation. *International Bankers Life Ins. Co. v. Holloway, supra.*

The district judge cited article 2.14–1 of the Texas Business Corporation Act which provides, in pertinent part:

Subject to any limitations in its articles of incorporation, a corporation may create and issue, whether or not in connection with the issuance and sale of any of its shares or other securities, (1) rights or options entitling the holders thereof to purchase from the corporation any of its shares of any class or classes or other securities.... In the absence of fraud in the transaction, the judgment of the board of directors as to the adequacy of the consideration received for such rights, options, or indebtedness shall be conclusive....

The court found no evidence of self-interest on the part of the Gearhart directors. The court further found that in issuing the debentures and warrants no fiduciary duty was breached by Gearhart's directors and the transaction was fair to the corporation for the following reasons, among others: (1) The board hired well-respected financial experts and counsel to aid it in preparing for an imminent takeover battle. Drexel Burnham's aim was to keep Gearhart in a credible position to continue business and to put Gearhart in a strong cash position in an effort to maintain flexibility. Drexel Burnham's advice appears sound and the board decided to follow it. (2) The transaction in question was structured and approved before Smith made its tender offer and may have been complete before Smith announced its intent to make a tender offer. (3) Discount bond offerings are commonplace and allow the issuer to avoid the need to make current cash interest payments. Moreover, Smith's own expert witness testified that the yield on the debentures was reasonable at the time of the transaction. In a similar, although public, offering involving Occidental Petroleum, completed the day before the Gearhart issuance, a comparable yield rate had been established. (4) The court found credible the testimony stating that the warrants were an integral and necessary part of the transaction. The investors put their faith in Gearhart and only had Gearhart's past record on which to base their investment decision. The warrants help to combat the uncertainty surrounding the fate of their investment and Gearhart. The valuation of the warrants was reasonable as well due to the inherent uncertainty of the situation. Their "springing" nature allows the investors some flexibility and also allows Gearhart to convert debt into equity. (5) Drexel Burnham's representative testified that in arriving at the exercise price of the warrants, his firm sought to eliminate the ef-

fects the recent Smith buying and possible tender offer had had on the market price of Gearhart stock. The evidence shows that through most of March, prior to the Smith buying blitz, Gearhart stock traded below the exercise price of approximately $24.60. (6) Both Mr. Gearhart and the Drexel Burnham representative advanced credible business reasons for the issuance, including: (a) retirement of debt that carried an interest rate that varied with the prime rate and on which Gearhart had had problems maintaining covenants; (b) the possible acquisition of an entity Gearhart had been considering; (c) raising necessary capital to produce skids pursuant to a purchase order; and (d) in general to maintain corporate flexibility in a time of uncertainty. The court likewise found that the proffered bases for the infusion of capital were reasonable. (7) The Court found without merit Smith's own contention that Gearhart could have found other means of raising capital. Specifically, Smith pointed to Wayne Bank's speech in March 1984 where he stated, as financial officer of Gearhart, that Gearhart had no plans to seek any financing at that time. It is obvious that numerous factors could have led Gearhart to reconsider that position. Smith also contended that Gearhart should have drawn on its significant revolving bank credit, rather than issue debentures. The court declined to question the business judgment of the directors without a showing of bad faith. (8) Additionally, the district judge upheld the transaction because it was negotiated at arm's length with sophisticated businessmen on both sides of the transaction.

Justice Douglas has written:

A director is a fiduciary. *Twin-Lick Oil Co. v. Marbury*, 91 U.S. 587, 588 [1 Otto], 23 L.Ed. 329, 330 [1875]. So is a dominant or controlling stockholder or group of stockholders. *Southern P. Co.*

*v. Bogert*, 250 U.S. 483, 492, 63 L.Ed. 1099, 1107, 39 S.Ct. 533 [537 (1919)]. Their powers are powers in trust. See *Jackson v. Ludeling*, [88 U.S. 616] 21 Wall. 616, 624, 22 L.Ed. 492, 495 [1874]. Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show *its inherent fairness from the viewpoint of the corporation and those interested therein.* *Geddes v. Anaconda Copper Min. Co.*, 254 U.S. 590, 599, 65 L.Ed. 425, 432, 41 S.Ct. 209 [212 (1921)]. *The essence of the test is whether or not under all the circumstances the transaction carries the earmarks of an arm's length bargain. If it does not, equity will set it aside.*

*Pepper v. Litton, supra,* 308 U.S. at 306–07, 60 S.Ct. at 245 (emphasis added). We think Justice Douglas' criteria for analyzing the fairness of a transaction are sensible. Accordingly, based upon the foregoing reasoning of the district court, we conclude that Gearhart made a sufficient showing of the fairness of the debentures/warrants transaction to the Gearhart corporation so that we are unable to say that the district judge abused his discretion in refusing to enjoin the transaction for a breach of the duty of loyalty.

As for the duty of care, Gearhart defended Smith's negligent mismanagement claim over the debentures/warrants issuance with the district court's version of the business judgment rule, i.e., that courts should not interfere with the business judgment of the board of directors unless the challenged action was made in bad faith.[9] In applying the correct Texas business judg-

---

**9.** The district court held that a Texas court will not question the business judgment of directors without a showing of bad faith. This is not precisely the business judgment rule in Texas. The good faith requirement enunciated in *International Bankers Life Ins. Co. v. Holloway, supra,* goes to inquire into both the duties of care and loyalty. Ubelaker at 785. The business judgment rule is a defense to the duty of care. As such, the Texas business judgment rule precludes judicial interference with the business judgment of directors absent a showing of fraud or an ultra vires act. If such a showing is not made, then the good or bad faith of the directors is irrelevant.

ment rule, i.e., that courts should not interfere with the business judgment of directors unless the transaction at issue is fraudulent or an ultra vires act, we find no abuse of discretion in the district judge's result. The district court relied on article 2.14–1 of the Texas Business Corporation Act, cited above, to show that the issuance of the debentures and warrants was not illegal. The judge further found that Smith has not alleged any fraud connected with the transaction, nor was there any evidence to support such a charge. He pointed out that merely because one of Gearhart's reasons for the transaction was to discourage Smith's impending tender offer does not make the transaction inherently illegal. Accordingly, we can imply from the court's opinion a finding of no breach of a duty of care that surmounts the defense of the Texas business judgment rule. We can find no abuse of the district judge's discretion in refusing to enjoin the debentures/warrants transaction for a breach of the duty of care.

As for Smith's contention that the business judgment rule has no relevance to the "springing" feature of the warrants, Smith has not made a sufficient showing that the issuance of the springing warrants was a violation of the directors' duty of care so as to require Gearhart to defend the board's actions with the business judgment rule.

■ Finally, Smith argues that the "springing" feature of the warrants is invalid under the Williams Act because it is a "manipulative" device prohibited by the Act and because it expressly impedes tender offers, thus interfering with the right of Gearhart shareholders to receive such offers. Smith cites *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366 (6th Cir. 1981), in support of its manipulation claim. We find this accusation meritless. 15 U.S.C. § 78n(e), section 14(e) of the Williams Act provides, in pertinent part:

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, *or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer* or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation.

(emphasis added). The term "manipulative" is not defined in either the Securities Exchange Act or the Williams Act. *Mobil Corp. v. Marathon Oil Co.*, 669 F.2d 366, 374 (6th Cir.1981). The Supreme Court has described "manipulative" as follows:

Use of the word "manipulative" is especially significant. It is and was virtually a term of art when used in connection with securities markets. It connotes intentional or willful *conduct designed to deceive or defraud investors* by controlling or artifically affecting the price of securities.

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976) (footnote omitted) (emphasis added). "Manipulation" is "virtually a term of art when used in connection with securities markets." *Ernst & Ernst*, 425 U.S. at 199 [96 S.Ct. at 1384]. The term refers generally to practices, such as wash sales, matched order, or rigged prices, *that are intended to mislead investors* by artificially affecting market activity. *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977). We find no evidence of any intent on Gearhart's part to deceive, defraud, or mislead investors by issuing the "springing" warrants. It was within the district judge's discretion to refuse to enjoin the debentures/warrants transaction.[10]

---

**10.** The warrant terms and conditions also contain a section, numbered 9(i), which permits the Gearhart directors to reduce the price for exercise of the warrants "to any amount deemed appropriate" by them. This clause appears to be designed to permit a company flexibility to cause warrants to be exercised. Obviously it is subject to misuse. When and if it is, the courthouse doors will be open.

### The Geosource Acquisition

The district court enjoined Smith's tender offer on June 5, 1984. Gearhart, however, was not ordered to stop trying to defeat the tender offer. Consequently, in addition to the debentures/warrants transaction, Gearhart concluded an agreement with Aetna Life and Casualty Company on July 6 to acquire Geosource, Inc., an Aetna investment. Geosource is a geophysical services and equipment company which has suffered significant recent losses. The bargain provided that Gearhart would receive Geosource in exchange for $50,000,-000 in cash plus 10,000,000 shares of newly issued Gearhart stock, thus giving Aetna 38.5% of the outstanding Gearhart common stock. An important feature of the deal commits Aetna to voting its acquired Gearhart shares in the next Gearhart directors election in accordance with the recommendation of a majority of the ten-member Gearhart board, not including the four directors to be designated by Aetna. On all other corporate matters, Aetna must vote its shares according to the wishes of a majority of the ten-member Gearhart board, including the Aetna designees. This means that the shares controlled by the current Gearhart management, plus the shares held by Aetna which, in effect, will be voted by the Gearhart directors, will lock up 42.6% of the vote in the next election of directors.

Smith learned of the pending Gearhart-Geosource deal on July 9 and applied to the federal district court for a preliminary injunction that same day. The Smith petition sought to stop the transaction from closing while Smith's tender offer was enjoined. The district court denied the request for an injunction, but directed that the Gearhart shares to be issued to Aetna could neither be voted at the next shareholders' meeting nor counted for purposes of ascertaining a quorum. No findings of fact were made, despite the extensive briefs and exhibits in the record before the district judge. The Geosource deal closed on July 14.

On appeal, Smith urges all of the arguments it made before the district judge.

The Geosource transaction, and the district court's orders regarding it, present appellate problems of some difficulty—difficulty stemming primarily from the cryptic nature of the court's order, the absence of factual findings supporting it, and the order's seemingly contradictory character. Presumably the trial court viewed the acquisition by Gearhart of Geosource as falling within the legitimate confines of the district court's version of the business judgment rule, i.e., the court will not disturb the directors' actions in the absence of bad faith, otherwise it would not have permitted it to go forward. If so, however, we are somewhat at a loss to discern on what basis it denied voting rights to the Gearhart shares that were issued in connection with it. In other words, how could the entire transaction have passed muster under the business judgment rule if the voting rights part of the deal could not?

The sole clue to the court's reasoning contained in its order is its observation that Texas law does not require a shareholder vote on transactions such as the Geosource purchase. In this the court is correct. Tex.Bus.Corp.Act Ann. arts. 5.09, 5.10 (Vernon 1980). Smith points out to us, however, as it did to the trial court, that a New York Stock Exchange rule may work serious consequences for Gearhart and its shareholders as a result of the issuance of the 10 million new shares in connection with the Geosource transaction. Section 312 of the New York Stock Exchange Listed Company Manual requires shareholder approval in such circumstances "[w]here the present or potential issuance of common stock or securities convertible into common stock could result in an increase in outstanding common shares approximating 18.5% or more...." As the 10,000,000 new shares in question vastly exceed this percentage, the spectre of delisting by the New York Stock Exchange attended the Geosource transaction and was recognized as attending it by Gearhart management. In a press release issued in connection with the purchase, Gearhart acknowledges the possibility of delisting but asserts that over-the-counter trading would, in that

event, be a "fully satisfactory trading alternative...." This may or may not be so, and the trial court made no finding regarding it. As reflected by post-argument filings, the New York Stock Exchange has announced its intention to begin delisting procedures with regard to Gearhart's stock when the NYSE's current study of its delisting policies is completed.

Several other courts, by contrast, have viewed New York Stock Exchange delisting as a severe setback indeed, one resulting in irreparable injury to corporate shareholders, and have enjoined the voting of shares acquired in transactions entered into by interested directors likely to occasion such delisting. *Norlin Corp. v. Rooney, Pace, Inc.*, No. 84 Civ. 0298 (S.D.N.Y. Apr. 16, 1984), aff'd. 744 F.2d 255 at 267–69 (2d Cir. 1984); *Van Gemert v. Boeing Co.*, 520 F.2d 1373, 1381 (2d Cir.1975); *Sonesta Int'l. Hotels v. Wellington Assoc.*, 483 F.2d 247, 254 (2d Cir.1973); *United Funds, Inc. v. Carter Products, Inc.* [1961–64 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91, 288 (Balt.Cir.Ct. May 16, 1963); *see also Missouri Portland Cement Co. v. H.K. Porter Co., Inc.*, 535 F.2d 388, 392–93 (8th Cir.1976). We are not prepared to hold, as matter of law, that for all corporations, in all circumstances, such is the case. *See Saunders Leasing System, Inc. v. Societe Holding Gray D'Albion*, 507 F.Supp. 627, 635 (N.D.Ala.1981). We are clear, however, that for *some* corporations, in *some* factual circumstances, it may be, and that for those corporations an action by the directors like-ly to produce such a consequence may be unfair to the corporation.

On the remand that we direct, the district court should consider the issues that we have noted and make factual determinations regarding them. It may be that Smith can present sufficient evidence to convince the court that the Gearhart directors who entered into the Geosource deal were interested, given circumstances such as the eight-day time span from contract to closing, the fact that Gearhart was in the throes of battle for control of the company at that time, and the retention in Gearhart management of voting control of all the new shares, a provision we think is particularly suspicious. If Smith can make its case for interested directors, then the burden is on Gearhart to convince the court that the Geosource acquisition is fair to the corporation. In determining whether the transaction is fair, the court should consider the factors militating in favor of the acquisition as well as those militating against it, since both sets of factors presumably informed the judgment of the directors. We note that should the trial court determine that the directors, in consummating the Geosource transaction in the face of the likelihood of delisting as a consequence, have transgressed the bounds of fairness, an effective cure lies ready to hand. Ratification of the transaction by the shareholders at the forthcoming annual meeting would seem to remove all doubts and questions regarding delisting and whether the shares held by Aetna as a consequence of the transaction might properly be voted at that meeting.[11] Should the

---

11. Federal legislation entitled "Tender Offer Reform Act of 1984" is pending which would make it illegal for a corporation to enter into transactions such as the Geosource acquisition and the debentures/warrants package without shareholder approval. Section 204(a) of H.R. 5693, amending 15 U.S.C. § 78n, provides, in pertinent part:

"(f) During a tender offer for, or request or invitation for tenders of, any class of any equity security which is registered pursuant to section 12 of this title or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 12(g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, other than an offer, request, or invitation by the issuer, it shall be unlawful for the issuer—

"(1) to enter into or amend, directly or indirectly, agreements containing provisions, whether or not dependent on contingency, that increase, directly or indirectly, the current or future compensation of any officer or director, except that this provision shall not prohibit routine increases in compensation, or other routine compensation agreements,

Gearhart shareholders uphold the action of management in acquiring Geosource, delisting need no longer be feared, any violation of the duty of loyalty would be mooted, and the Aetna shares could thereafter be properly voted. Needless to say, should the shareholders decline to ratify, the district court should void the Geosource acquisition. We pretermit further discussion of possible remedies to be applied by the trial court since that court may never reach such questions and because what is an appropriate remedy for whatever transgression the trial court may discern, if any, is for it to determine in the first instance.

### Conclusion

We have examined the other contentions advanced on appeal by the various parties and conclude that they lack sufficient merit to warrant discussion. For the reasons stated, we therefore

1. Modify the court's injunction of the Smith tender offer to provide that the injunction shall extend until the day on which an amended 14(e) disclosure by Smith is approved by the trial court, and for such brief period thereafter as the court shall conclude is necessary for Gearhart shareholders to learn of and evaluate the amended disclosure;

2. Vacate the trial court's order sterilizing voting rights in the 10 million common shares acquired by Aetna in the Geosource transaction and remand for further proceedings consistent with this opinion; and

3. Affirm the June 5, 1984, order of the trial court in all other respects.

4. Modify the order of this Court entered July 17, 1984, forbidding, among other things, any further extraordinary capital transactions by any party so as to provide that the order shall remain in force until the entry of a further order of the trial court dealing with the matters remanded and not thereafter.

5. Authorize resetting by the trial court of the annual shareholders' meeting presently scheduled for October 1, 1984, should the trial court conclude that further time is required for the parties or shareholders to prepare for it.

Each party shall bear its own costs. It is so

ORDERED.

---

instituted in the normal course of business; or

"(2) to acquire, by a tender offer or request or invitation for tenders or otherwise, any of its voting securities, unless such acquisition and its terms are approved by the affirmative vote of a majority of the aggregate voting securities of the issuer, except that an issuer may undertake routine acquisitions of securities through ongoing programs undertaken in the ordinary course of the issuer's business. "(g)(1) During a tender offer for, or request or invitation for tenders of, any class of any equity security which is registered pursuant to section 12 of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 12(g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, other than an offer, request, or invitation by the issuer, or a third party solicitation of proxies, consents, or authorizations from any holder of securities of an issuer, it shall be unlawful for the issuer to grant voting power or to issue any combination of securities (including, but not limited to, options, rights, warrants, or convertible or other securities) which, upon granting or issuance (or if converted or exercised upon issuance), would in the aggregate constitute more than 5 per centum of a class of voting securities or have more than 5 per centum of the aggregate voting power of the issuer after such grant, issuance, conversion, or exercise, unless the specific grant or issuance and its terms are approved by the affirmative vote of a majority of the aggregate voting securities of the issuer. H.R. 5693, 98th Cong. 2d Sess. § 2, 8–9 (1984) (Comm. Print Aug. 3, 1984). This proposed bill has been approved by the House Committee on Energy and Commerce and will be reported to the House in the near future, probably in September of 1984.