# Supreme Court of Texas

No. 20-0178

In the Matter of the Estate of Richard C. Poe, Deceased

On Petition for Review from the
Court of Appeals for the Eighth District of Texas

**Argued December 2, 2021**

JUSTICE HUDDLE delivered the opinion of the Court.

Justice Young did not participate in the decision.

This case arises from a struggle for control of a substantial family-owned car-dealership enterprise following the death of the patriarch, Dick Poe. In the weeks before he passed, Dick, who was the sole director of Poe Management, Inc. (PMI), authorized the corporation to issue new shares. Dick bought the new shares for $3.2 million. This made Dick the majority owner of PMI, which was the general partner of several Poe-owned businesses. As a result of the purchase, Dick's death vested control of the family enterprise in the two co-executors of Dick's estate rather than Dick's son, Richard, who was PMI's only other shareholder.

Richard challenged the share issuance as a breach of Dick's fiduciary duty and prevailed at trial. But petitioners here assert the jury was improperly charged on the critical issue: whether Dick's

admittedly self-dealing share issuance was fair to PMI and, therefore, valid and enforceable under Texas Business Organizations Code Section 21.418(b). Petitioners also contend the probate court improperly submitted a theory of liability not recognized in Texas law: that Dick, as PMI's sole director, owed Richard an "informal" fiduciary duty to manage PMI in Richard's best interest. We agree with petitioners that the probate court erred in charging the jury in both respects, and we hold that the errors were harmful. We therefore reverse and remand for a new trial.

## I.   Background

Richard C. Poe, popularly known as "Dick Poe," was a businessman and third-generation car dealer in El Paso. Dick was involved in the daily operations of the car dealerships well into his eighties and until the time of his death. Dick had two sons, and, for many years, the older of the two, Richard C. Poe II,[1] believed he would succeed Dick as the person who controlled the enterprise. But shortly before Dick's death, things changed.

Dick structured his many businesses to consolidate control in a single entity: PMI, a Texas corporation he formed in 2007. At the time of Dick's death, PMI was the general partner of five limited partnerships, three of which owned and operated car dealerships in El Paso—Dick Poe Toyota, Dick Poe Chrysler, and Dick Poe Dodge. Another of the limited partnerships owned the property on which Dick Poe Toyota was located, as well as a shopping center. The fifth was a

---

[1] For convenience, we refer to the father, Richard C. Poe, as "Dick," and the son, Richard C. Poe II, as "Richard."

2

family limited partnership in which equal shares were owned by two limited partners: Richard and a special needs trust Dick created to care for his other son, Troy.[2]

When Dick formed PMI, it had authority to issue 10,000 shares of common stock, but it issued only 1,000 shares, all to a single shareholder: Richard. Richard, in turn, ceded control of PMI to Dick. This was accomplished first through an irrevocable proxy to vote Richard's shares and, later, through Richard's successive annual appointment of Dick as PMI's sole director. Thus, while Richard owned 100% of the outstanding shares of PMI, Dick always controlled PMI. There is no evidence that Richard ever sought any contractual right to maintain a majority ownership interest in PMI or that he ever sought to serve as a PMI director.

In early 2015, Dick's health rapidly declined, and he was placed in hospice care. In May 2015, Dick, as PMI's sole director, authorized the issuance of 1,100 shares of PMI common stock to himself in exchange for approximately $3.2 million. The resolution authorizing this share issuance was dated May 1, 2015, and Dick paid PMI for the shares five days later, on May 6, 2015. It is undisputed that Richard was never advised of this share issuance until after Dick's death on May 16, 2015.

After learning about the share issuance, Richard brought direct and derivative claims[3] against several parties in the probate court where

---

[2] Troy was born with cerebral palsy and requires full-time care.

[3] *See generally* TEX. BUS. ORGS. CODE § 21.563(c)(1) (allowing courts to treat a derivative proceeding brought by a shareholder of a closely held corporation as a direct action for the shareholder's own benefit); *see also id.*

Dick's will was filed. Richard sued Dick's estate through the two independent co-executors named in Dick's will: Anthony Bock and Karen Castro,[4] who were Dick's longtime accountant and office manager/comptroller, respectively. Richard asserted that the share issuance was invalid because:

(1)     it was a self-dealing transaction by Dick, a PMI director, that violated Dick's fiduciary duties to PMI;

(2)     it violated a fiduciary duty Dick owed *to Richard*, which arose by virtue of a "confidential relationship" between them; and

(3)     Dick lacked the mental competence to issue and purchase the PMI shares.

Richard also sued Bock, Castro, and a third individual—Paul Sergent, Dick's longtime attorney—in their individual capacities for allegedly breaching their fiduciary duties to PMI[5] and for conspiring with Dick to breach his. Richard requested relief in the form of damages and a declaratory judgment.

In response, the defendants, who are petitioners here, asserted that Dick did not owe a Richard a fiduciary duty to manage PMI in Richard's best interest; rather, Dick's duty with respect to the management of PMI was to exercise his business judgment for the sole

---

§ 21.563(b) (providing that certain limitations on derivative proceedings, such as the need for a written demand to the corporation, do not apply to closely held corporations).

[4] We will refer to Bock and Castro in their capacity as executors of Dick's estate as "the Estate."

[5] Sergent and Castro were officers of PMI at the time of the share issuance and at the time of trial. Bock was elected an officer of PMI following Dick's death.

4

benefit of the corporation. Petitioners also argued that all the relief Richard sought was barred because the share issuance was fair to PMI and deemed valid and enforceable by the statutory safe harbor set forth in Business Organizations Code Section 21.418(b)(2).[6]

Richard's general theory at trial was that Dick would not have chosen to deprive Richard of the right to control the family business. Richard asserted that Sergent, Bock, and Castro took advantage of Dick's deteriorating condition and masterminded the share issuance to wrest control over PMI from Richard. Sergent, Bock, and Castro countered that, during the months before he died, Dick repeatedly

---

[6] Section 21.418(b) provides that an otherwise valid and enforceable transaction between a corporation and one or more directors or officers is valid and enforceable, despite being a self-dealing transaction, if any one of three distinct conditions is true:

(1) the material facts are disclosed to the board of directors or a committee of the board of directors, which in good faith authorizes the transaction by a majority of disinterested directors or committee members;

(2) the material facts are disclosed to the shareholders entitled to vote on authorizing the transaction and the transaction is specifically approved in good faith by a vote of the shareholders; or

(3) the transaction is fair to the corporation when it is authorized, approved, or ratified by the board of directors, a committee of the board of directors, or the shareholders.

TEX. BUS. ORGS. CODE § 21.418(b)(1), (2).

If any one of the conditions in subsection (b) is satisfied, Section 21.418(e) provides that neither the corporation nor any of its shareholders will have a cause of action against the interested director or officer for breach of duty with respect to making, authorizing, or performing the transaction because of the director's or officer's interest in the corporation. *Id.* § 21.418(e).

5

expressed concerns about Richard's ability to manage the business and wanted to ensure someone other than Richard would control PMI.

The trial was bifurcated. The first phase focused on whether the share issuance was valid. Before trial, the probate court informed the parties this would be determined by three sub-issues: (1) whether Dick had the mental capacity to issue and purchase the shares, (2) whether the share issuance breached an informal fiduciary duty Dick owed to Richard, and (3) whether the share issuance was valid under Section 21.418 of the Business Organizations Code. At the close of Richard's case-in-chief, however, the probate court granted a directed verdict against Richard's claim regarding Dick's mental capacity.

The parties sharply disagreed about how to submit the remaining issues. Richard's proposed submission consisted of separate questions asking whether (1) Dick breached his fiduciary duty to PMI, (2) Dick owed and breached a fiduciary duty to Richard, (3) the share issuance was valid and enforceable under Section 21.418(b), and (4) the share issuance complied with Dick's duties under PMI's bylaws. By contrast, petitioners asserted that only the relevant condition in Section 21.418(b) should be submitted: whether the share issuance was fair to PMI. They also argued that Dick did not owe any separate "informal" fiduciary duty to Richard with regard to the management of PMI.[7]

The probate court submitted four questions to the jury, and petitioners objected to all four. They argued the first three, related to

---

[7] Before trial, the Estate moved for a partial summary judgment that Dick owed a fiduciary duty solely to PMI and not to Richard individually. The probate court denied the motion.

an "informal" fiduciary duty, should not be submitted at all because Dick's duty was to manage PMI for the sole benefit of the corporation and he therefore could not also have a duty to manage PMI in the best interest of Richard.

As submitted, Question 1 asked the predicate question to determine whether Dick owed an informal fiduciary duty[8] to Richard:

> Did a relationship of trust and confidence exist between Dick and Richard?
>
> A relationship of trust and confidence existed if Richard justifiably placed trust and confidence in Dick to operate PMI in a manner that was consistent with Richard's best interest. Richard's subjective trust and feelings alone do not justify transforming arm's-length dealings into a relationship of trust and confidence.
>
> This relationship must have been mutual and understood as such by both Richard and Dick.
>
> Answer "Yes" or "No."

Questions 2 and 3 were predicated on a "Yes" answer to Question 1. Question 2 asked the jury whether the relationship of trust and confidence between Richard and Dick terminated before May 1, 2015. Question 3 then asked the jury about breach:

> Did Dick comply with his fiduciary duty to Richard with respect to his management of PMI?

---

[8] The language of Question 1 generally follows PJC 104.1 of the Texas Pattern Jury Charges, which "submits the existence of an informal fiduciary relationship." STATE BAR OF TEXAS, TEXAS PATTERN JURY CHARGES: BUSINESS, CONSUMER, INSURANCE & EMPLOYMENT PJC 104.1 cmt. (2018).

7

Given the relationship of trust and confidence between Dick and Richard, Dick owed Richard a fiduciary duty. To prove Dick complied with his duty, the Estate must show:

1. the share issuance was fair to Richard; and

2. Dick made reasonable use of the confidence that Richard placed in him; and

3. Dick acted in the utmost good faith and exercised the most scrupulous honesty toward Richard; and

4. Dick placed the interests of Richard before his own and did not use the advantage of his position to gain any benefit for himself at the expense of Richard; and

5. Dick fully and fairly disclosed all important information to Richard concerning the share issuance.

In answering whether the share issuance was fair to Richard, you should consider all circumstances surrounding the transaction.

Answer "Yes" or "No."

Petitioners also objected to Question 4, which addressed their statutory safe-harbor defense, on multiple grounds. But, over their objection, the probate court included all the conditions in Section 21.418(b) regardless of applicability. It read as follows:

Is the share issuance valid and enforceable under the Texas Business Organizations Code?

The share issuance is valid and enforceable if any one of the following conditions is satisfied:

(1) the material facts as to the share issuance were disclosed to or known by:

(A) PMI's board of directors, and the board of directors in good faith authorized the share

8

issuance by the approval of the majority of the disinterested directors, or

    (B)    the shareholders entitled to vote on the share issuance, and the share issuance is specifically approved in good faith by a vote of the shareholders; or

(2)    the share issuance is fair to PMI when it is authorized, approved, or ratified by the board of directors or the shareholders.

In answering whether the share issuance was valid and enforceable, you should consider all circumstances surrounding the transactions.

Answer "Yes" or "No."

In a 10–2 verdict, the jury found Dick owed and breached an informal fiduciary duty to Richard. The jury also failed to find that the share issuance was valid and enforceable in response to Question 4.

The second phase of the trial addressed Richard's conspiracy and damages claims. Richard argued that Sergent, Bock, and Castro were liable either for breaching their own fiduciary duties to PMI or for conspiring with Dick to cause the share issuance. Richard initially sought damages against all defendants but later abandoned on the record his claim for damages against the Estate. At the close of Richard's case-in-chief, the probate court directed a verdict for the individual defendants on all of Richard's claims against them.

The probate court rendered a judgment declaring the share issuance invalid and unenforceable and ordering the return of the $3.2 million Dick paid for the shares. It also rendered a take-nothing judgment on Richard's individual claims against Sergent, Bock, and Castro.

9

Both sides appealed. The court of appeals affirmed the judgment in part and reversed and remanded in part. 591 S.W.3d 607 (Tex. App.— El Paso 2019). It held Question 4 contained "superfluous" language but any error regarding its submission was harmless as there was sufficient evidence to support the jury's failure to find that the share issuance was fair to PMI. *Id.* at 629–31. Because the court of appeals concluded the jury's answer to Question 4 was sufficient to support the judgment's declaration that the share issuance was invalid, the court found it unnecessary to address the informal-fiduciary-duty theory submitted through the first three questions. *Id.* at 635. But the court noted that these issues were "substantial, and in some respects raise important questions under Texas law." *Id.*

The Estate argued in the court of appeals that the probate court abused its discretion by admitting evidence and permitting argument regarding (1) the interpretation of PMI's bylaws and Richard's claim they required notice to him of the share issuance, and (2) efforts by the Toyota distributor to terminate Dick Poe Toyota's franchise following the share issuance. *Id.* at 636–38. The court of appeals rejected these claims. *Id.* Notably, the court held that the lack of notice to Richard was relevant to the fairness issue in Question 4 or the fiduciary duty Dick allegedly owed under Questions 1 and 3. *Id.* at 638.

On Richard's cross-appeal, the court of appeals affirmed the dismissal of Richard's claims against the individual defendants, with two exceptions. First, the court reversed the directed verdict in favor of Sergent on Richard's conspiracy claim, concluding there was sufficient evidence to submit to a jury whether Sergent conspired with Dick by

10

rendering legal advice regarding the share issuance.[9]  *Id.* at 648. Second, the court reversed the directed verdict as to Richard's claims for disgorgement against Sergent and Bock for billing PMI for legal and accounting services, respectively.  *Id.* at 643–44.

The Estate and Sergent each petitioned this Court for review.

## II.  Discussion

Petitioners challenge the court of appeals' conclusion that any error in submitting the Section 21.418(b) safe-harbor defense in Question 4 was harmless.  They also assert it was error for the court of appeals to reach that conclusion without considering whether the informal-fiduciary-duty theory was erroneously submitted in Questions 1 through 3.  In petitioners' view, the charge errors cannot be analyzed in isolation because the evidence admitted to support the informal-fiduciary-duty theory misled the jury in its consideration of the Section 21.418(b) fairness defense submitted in Question 4.

A trial court's duty is to submit only those questions, instructions, and definitions raised by the pleadings and the evidence.  *Thota v. Young*, 366 S.W.3d 678, 693 (Tex. 2012); *Harris County v. Smith*, 96 S.W.3d 230, 236 (Tex. 2002); *see also* TEX. R. CIV. P. 278 ("The court shall

---

[9] One of Sergent's arguments in the probate court was that he could not be subjected to civil liability for providing legal advice to Dick.  *See Haynes & Boone, LLP v. NFTD, LLC*, 631 S.W.3d 65, 81 (Tex. 2021).  The court of appeals concluded that attorney immunity is an affirmative defense that was not raised in Sergent's pleadings, so it could not affirm the directed verdict in Sergent's favor on that ground.  591 S.W.3d at 648 n.19.  The court expressed no opinion on how attorney immunity might apply on remand if properly raised.  *Id.* Sergent does not raise this argument here, so we likewise express no opinion on its potential application.

11

submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence."). A question or instruction cannot be submitted to the jury unless it has been properly raised by the pleadings and the evidence. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 855 (Tex. 2009) (stating that a jury instruction must "find[] support in the pleadings and evidence"); *Hill v. Winn Dixie Tex., Inc.*, 849 S.W.2d 802, 803 (Tex. 1992) (concluding that an unavoidable-accident instruction was erroneous when there was no affirmative evidence to support it); *Wal-Mart Stores, Inc. v. Redding*, 56 S.W.3d 141, 149 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (holding the trial court erred in submitting an element of damages to the jury for which there was no evidence); *Eldridge v. Collard*, 834 S.W.2d 87, 90 (Tex. App.—Fort Worth 1992, no writ) (holding the trial court erred by submitting a question that was not "properly raised by the pleadings and the evidence").

Yet even if a trial court errs in submitting a jury question or instruction, we cannot reverse a judgment for charge error unless that error was harmful. *Thota*, 366 S.W.3d at 687; *see also* TEX. R. APP. P. 61.1(a) ("No judgment may be reversed on appeal on the ground that the trial court made an error of law unless the Supreme Court concludes that the error complained of . . . probably caused the rendition of an improper judgment . . . ."). "Charge error is generally considered harmful if it relates to a contested, critical issue." *Thota*, 366 S.W.3d at 687 (quoting *Hawley*, 284 S.W.3d at 856); *see also Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 755 (Tex. 1998)

12

("Error in instructions to the jury is more likely to be harmful in a closely contested case."). An improper instruction is especially likely to cause an improper judgment when "the trial is contested and the evidence sharply conflicting." *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 480 (Tex. 2001). In determining whether error in the charge requires reversal, we analyze the entire record. *Timberwalk*, 972 S.W.2d at 756.

Submission of an improper jury question can be harmless if the jury's answers to other questions render the improper question immaterial. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995). But submission of an immaterial issue can be harmful if it "confused or misled the jury" in answering questions that were material to the judgment. *Id.*; *see also Boatland of Hous., Inc. v. Bailey*, 609 S.W.2d 743, 750 (Tex. 1980); Tex. R. App. P. 61.1(a). To determine whether a particular question or instruction confused or misled the jury, we "consider its probable effect on the minds of the jury in the light of the charge as a whole." *Alvarado*, 897 S.W.2d at 752 (quoting *Tex. Emps. Ins. Ass'n v. McKay*, 210 S.W.2d 147, 149 (Tex. 1948)).

## A. Did the probate court err in submitting Richard's informal-fiduciary-duty theory?

Questions 1 through 3 all relate to Richard's theory that Dick owed and breached an "informal" fiduciary duty arising from a special relationship of trust and confidence between the two of them. *See Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005). The court of appeals did not address any of petitioners' challenges to Questions 1 through 3 because the court concluded that the jury's answer to Question 4 was sufficient to support the probate court's judgment. 591 S.W.3d at 635. Even though it noted that the issues relating to Questions 1 through 3

13

were "substantial" and "in some respects raise important questions under Texas law," *id.*, the court held they were not "necessary to final disposition of the appeal." *Id.* (quoting TEX. R. APP. P. 47.1). Richard likewise contends that it is unnecessary for us to consider any alleged errors regarding Questions 1 through 3.

We disagree. Even if the erroneous submission of a jury question is immaterial, it can still constitute harmful error if "the submission confused or misled the jury" when it answered other questions that were material to the judgment. *Alvarado*, 897 S.W.2d at 752. Petitioners argue just that: they contend the probate court's error in submitting Richard's informal-fiduciary-duty theory of liability in Questions 1 through 3 confused and misled the jury with respect to Question 4.

There is another reason to consider whether submission of the informal-fiduciary-duty theory was proper. The court of appeals reversed the probate court's directed verdict on Richard's conspiracy claim against Sergent. 591 S.W.3d at 648. Richard alleged that Sergent conspired with Dick to breach *both* his fiduciary duty to PMI *and* his alleged informal fiduciary duty to Richard. But Sergent cannot be liable for conspiring to breach an informal fiduciary duty unless Dick owed such a duty. *See Kline v. O'Quinn*, 874 S.W.2d 776, 786 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (holding that a bank cannot be liable for knowing participation in another's breach of fiduciary duty unless a fiduciary duty was owed); *see also Chu v. Hong*, 249 S.W.3d 441, 444 (Tex. 2008) ("Conspiracy is a derivative tort . . . ."). If petitioners are correct that Texas law does not recognize an informal fiduciary duty requiring a director to manage the corporation in the best interest of a

14

shareholder, then Sergent cannot be liable for conspiring to breach such a duty. Accordingly, we will address petitioners' complaint regarding Questions 1 through 3.

Under Texas law, the business and affairs of a corporation are managed through a board of directors. TEX. BUS. ORGS. CODE § 21.401(a). Directors owe a fiduciary duty to their corporations in the actions they take as directors. *Ritchie v. Rupe*, 443 S.W.3d 856, 868 (Tex. 2014). A director's fiduciary status creates three broad duties: duties of obedience, loyalty, and due care. *Loy v. Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004, pet. denied) (citing *Gearhart Indus., Inc. v. Smith Int'l, Inc.*, 741 F.2d 707, 719 (5th Cir. 1984)). These fiduciary duties run to the corporation, not to individual shareholders or even to a majority of shareholders. *Gearhart Indus.*, 741 F.2d at 721. As we explained in *Ritchie*, a director's fiduciary duty includes a duty to dedicate "uncorrupted business judgment for the sole benefit of the corporation." 443 S.W.3d at 868 (quoting *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963)).

Our Court has recognized that an "informal" fiduciary duty may arise from "a moral, social, domestic or purely personal relationship of trust and confidence." *Meyer*, 167 S.W.3d at 331 (quoting *Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 287 (Tex. 1998)). We have described the types of confidential relationships that can give rise to a fiduciary duty imprecisely as those "in which influence has been acquired and abused, in which confidence has been reposed and betrayed." *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Corp.*, 823 S.W.2d 591, 594 (Tex. 1992) (quoting *Tex. Bank & Tr. Co. v. Moore*,

15

595 S.W.2d 502, 507 (Tex. 1980)). But we have always made clear that "we do not create such a relationship lightly." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 177 (Tex. 1997). And we have never recognized an informal fiduciary duty within the context of the operation or management of a corporation, in which the corporation's directors have clearly defined duties to exercise their business judgment for the sole benefit of the corporation. *See Ritchie*, 443 S.W.3d at 868.

Here, Richard alleged that, based on their personal relationship of "confidence and trust," Dick owed a fiduciary duty to Richard individually, in addition to Dick's duties to PMI. According to Richard, this duty required Dick to manage PMI in a manner consistent with Richard's best interest. The probate court agreed to submit the theory. Thus, despite the acknowledgment of all involved that Dick, as PMI's director, was bound to dedicate his "uncorrupted business judgment for the sole benefit of [PMI]," *id.* (quoting *Holloway*, 368 S.W.2d at 577), the probate court determined Dick might also be bound to simultaneously dedicate his business judgment for the benefit of Richard.

Petitioners contend that Texas law should not recognize an informal fiduciary duty to a shareholder with respect to a director's management of a corporation because, as *Ritchie* confirms, the director has a duty to manage a corporation solely in the corporation's best interests. Richard responds that Texas law recognizes informal fiduciary duties where, as the jury found here, a confidential relationship exists. He argues this duty does not disappear merely because Dick might potentially owe conflicting duties to the corporation.

16

Both sides claim *Ritchie* supports their position. The question in *Ritchie* was whether a minority shareholder in a closely held corporation could assert a statutory or common-law cause of action against the corporation's directors for oppressing the minority shareholder's rights. *Id.* at 860. We concluded that Texas law does not recognize such a claim. *Id.* In particular, we held that, "[a]bsent a contractual or other legal obligation, the officer or director has no duty to conduct the corporation's business in a manner that suits an individual shareholder's interests when those interests are not aligned with the interests of the corporation and the corporation's shareholders collectively." *Id.* at 888–89 (footnote omitted). We instead noted that disputes in closely held corporations may be prevented and resolved through shareholders' agreements and that the Legislature granted corporate founders and owners "broad freedom to dictate for themselves the rights, duties, and procedures that govern their relationship with each other and with the corporation." *Id.* at 881. And we adhered to our longstanding rule that directors' fiduciary duties to the corporation include "the dedication of [their] uncorrupted business judgment for the sole benefit of the corporation." *Id.* at 868 (quoting *Holloway*, 368 S.W.2d at 577) (alteration in original).

Despite acknowledging this general rule, Richard argues that this case involves the type of "other legal obligation" that might require Dick to act in Richard's interests notwithstanding Dick's duties as director to the corporation. *See id.* at 888–89. The example we cited in *Ritchie* was that "informal fiduciary duties" may exist when "a special relationship of trust . . . arise[s] between parties prior to and independent from the

17

parties' business relationship." *Id.* at 889 n.58. As Richard points out, we remanded that case for the court of appeals to address challenges to the jury's finding that the majority shareholders owed an informal fiduciary duty to the plaintiff. *Id.* at 892. In doing so, we did not recognize any such duty existed under the facts of that case. Nor did we suggest that a corporation's officers or directors could owe a fiduciary duty to an individual shareholder with respect to their operation or management of the corporation in conflict with the duty owed to the corporation.[10]

Here, the jury was asked whether Richard justifiably placed trust and confidence in Dick "to operate PMI in a manner that was consistent with Richard's best interest." We have never held, in *Ritchie* or elsewhere, that a corporation's director, while owing formal fiduciary duties to the corporation requiring him to manage the corporation's affairs for the sole benefit of the corporation, simultaneously owes an informal fiduciary duty to a shareholder to operate the corporation for that shareholder's benefit or consistent with the shareholder's best interest. On the contrary, *Ritchie* suggests those two duties are

---

[10] The primary issues in *Ritchie* were whether the majority shareholders and directors of a closely held corporation engaged in oppressive conduct that affected a minority shareholder's ability to sell her shares and whether a court-ordered buy-out of her shares was an authorized remedy. In addition to being asked whether the defendants engaged in oppression, the jury was asked whether the defendants, solely in their capacities as shareholders, owed an informal fiduciary duty to the plaintiff. On remand, the court of appeals held there was no evidence of a relationship of trust and confidence to support any informal fiduciary duty. *Ritchie v. Rupe*, No. 05-08-00615-CV, 2016 WL 145581, at *1 (Tex. App.—Dallas Jan. 12, 2016, pet. denied).

18

incompatible. 443 S.W.3d at 888–89 (stating that a corporation's director owes no duty to conduct the corporation's business in a manner that benefits an individual shareholder). We reaffirm this principle today and hold that a director cannot simultaneously owe these two potentially conflicting duties. By electing to form and own PMI as a corporation, the parties disclaimed the existence of duties regarding the management of the corporation's affairs beyond those that exist by statute or arise from the corporation's formation documents or other agreement. *See id.* at 879 ("[C]orporations and the relationships among those who participate in them . . . are largely matters governed by statute and contract."); *Empire Mills v. Alston Grocery Co.*, 15 S.W. 505, 505 (Tex. Ct. App. 1891) ("A corporation is the creature of a statute immediately creating it, or authorizing proceedings for its organization.").

Accordingly, we conclude the probate court erred in submitting Question 1 because, as a matter of law, a corporation's director cannot owe an informal duty to operate or manage the corporation in the best interest of or for the benefit of an individual shareholder. A director's fiduciary duty in the management of a corporation is solely for the benefit of the corporation.[11] *See Ritchie*, 443 S.W.3d at 868; *Holloway*, 368 S.W.2d at 577.

---

[11] Questions 2 and 3 were defensive questions on which the Estate had the burden of proof, and both were conditioned on the jury's affirmative answer to Question 1. Because the probate court erred in submitting Question 1, there was likewise no basis for submitting Questions 2 and 3.

19

**B.    Did the probate court err in submitting the Section 21.418(b) safe-harbor defense?**

Under the common law, a contract between a corporation and director was not automatically void but was voidable for unfairness and fraud. *Holloway*, 368 S.W.2d at 576. The burden was on the director (as fiduciary) to prove that the contract was fair. *Id.*; *see also Tex. Bank & Tr. Co.*, 595 S.W.2d at 508–09 (holding that a fiduciary who benefits from a transaction with his or her principal has the obligation to establish the fairness of the transaction). This Court and others have recognized certain circumstances under which a director could establish that his or her transaction with the corporation was valid. *See Tenison v. Patton*, 67 S.W. 92, 96 (Tex. 1902) (holding that a director's transaction with a corporation would not be invalid if the director established that a quorum of disinterested directors approved the transaction after full disclosure and that the director obtained no undue advantage from the transaction); *Wiberg v. Gulf Coast Land & Dev. Co.*, 360 S.W.2d 563, 567 (Tex. App.—Beaumont 1962, writ ref'd n.r.e.) (holding that a contract between a director and the corporation may be ratified by a majority of the shareholders after full disclosure).

Business Organizations Code Section 21.418(b), originally enacted in 1985,[12] reflects the Legislature's determination that

---

[12] The substance of Section 21.418(b) was originally enacted as article 2.35–1 of the Business Corporation Act. Act of May 7, 1985, 69th Leg., R.S., ch. 128, § 9, 1985 Tex. Gen. Laws 592, 597. The Legislature adopted the Business Organizations Code in 2003 and incorporated former article 2.35–1 as Section 21.418. Act of May 13, 2003, 78th Leg., R.S., ch. 182, § 1, sec. 21.418, 2003 Tex. Gen. Laws 267, 443. Subsection (e) was added in 2011. Act of May 11, 2011, 82d Leg., R.S., ch. 139, § 28, 2011 Tex. Gen. Laws 650, 659.

transactions between a corporation and an interested director should be given full legal effect if certain conditions are met. TEX. BUS. ORGS. CODE § 21.418(b). Section 21.418(b) provides:

> An otherwise valid and enforceable contract or transaction [between a corporation and a director] is valid and enforceable, and is not void or voidable, . . . if any one of the following conditions is satisfied:
>
> (1)    the material facts as to the relationship or interest . . . and as to the contract or transaction are disclosed to or known by:
>
> > (A)    the corporation's board of directors or a committee of the board of directors, and the board of directors or committee in good faith authorizes the contract or transaction by the approval of the majority of the disinterested directors or committee members, regardless of whether the disinterested directors or committee members constitute a quorum; or
> >
> > (B)    the shareholders entitled to vote on the authorization of the contract or transaction, and the contract or transaction is specifically approved in good faith by a vote of the shareholders; or
>
> (2)    the contract or transaction is fair to the corporation when the contract or transaction is authorized, approved, or ratified by the board of directors, a committee of the board of directors, or the shareholders.

*Id.* § 21.418(b). Section 21.418(b) thus sets forth three distinct conditions under which a self-dealing transaction is deemed "valid and enforceable, and . . . not void or voidable": (1) the transaction was approved by a majority of disinterested directors with knowledge of material facts; (2) the transaction was approved by a vote of

21

shareholders with knowledge of material facts; or (3) the transaction was "fair to the corporation when the contract or transaction [was] authorized, approved, or ratified." *Id.* The burden of proving that a transaction falls within this safe harbor rests on the interested director. *See Roels v. Valkenaar*, No. 03-19-00502-CV, 2020 WL 4930041, at *6 (Tex. App.—Austin Aug. 20, 2020, no pet.); *see also Health Discovery Corp. v. Williams*, 148 S.W.3d 167, 169 (Tex. App.—Waco 2004, no pet.) (applying former TEX. BUS. CORP. ACT art. 2.35–1, the predecessor to Section 21.418(b)).

The Business Organizations Code also prescribes the effect of a finding that a transaction is within the safe harbor. Section 21.418(e) states:

> If at least one of the conditions of Subsection (b) is satisfied, neither the corporation nor any of the corporation's shareholders will have a cause of action against [the interested director or officer] for breach of duty with respect to the making, authorization, or performance of the contract or transaction because the person had the relationship or interest [that makes him an interested director or officer] . . . .

TEX. BUS. ORGS. CODE § 21.418(e).

In this case, the Estate argued that subsection (b)(2) applied because the share issuance was fair to PMI when it was authorized. *See id.* § 21.418(b)(2). The Estate also argued that neither of the conditions in subsection (b)(1) applied. Dick was PMI's only director, so the share issuance was not (and could not be) approved by a majority of disinterested directors. *See id.* § 21.418(b)(1)(A). And Richard, who was PMI's only shareholder before the share issuance, never voted on it. *See id.* § 21.418(b)(1)(B). While the Estate repeatedly argued that only

22

subsection (b)(2) should be submitted, Richard argued that all three conditions should be included in Question 4.

In this Court, petitioners argue that Question 4 was improper because it included extraneous instructions not supported by the evidence. We agree. The jury was instructed that the share issuance was "valid and enforceable" if it found any one of the three conditions set forth in Section 21.418(b) was satisfied. But, as petitioners argue, the evidence supported submission of only one: whether the share issuance was fair to PMI. There was no evidence that would support a finding of the other two conditions. It is undisputed that Dick was PMI's only director; therefore, it would have been impossible for a "majority of the disinterested directors" to authorize the share issuance. *Id.* § 21.418(b)(1)(A). Likewise, the share issuance was never approved by "a vote of the shareholders." *Id.* § 21.418(b)(1)(B). Richard was PMI's sole shareholder at the time of the share issuance, and it is undisputed that he never voted for or against it.

An instruction is improper if it is not supported by the pleadings and evidence. *See Hawley*, 284 S.W.3d at 855. The court of appeals correctly concluded that Question 4 contained "superfluous" instructions. 591 S.W.3d at 630. In the absence of affirmative evidence supporting them, it was error to instruct the jury that it could find the share issuance valid and enforceable based on board or shareholder approval. *See Hill*, 849 S.W.2d at 803. We conclude the probate court abused its discretion by instructing the jury that it could find the share issuance valid and enforceable based on the two conditions in

23

Section 21.418(b)(1) when there was no evidence that could support a finding of either.[13]

In summary, we agree with petitioners that the probate court abused its discretion by submitting Questions 1 through 3. With respect to Question 4, we agree that the probate court erred in instructing the jury that it could find the share issuance was valid and enforceable based on two conditions (approval by the board of directors or shareholders) for which there was no evidence.

## C.    Were the charge errors harmful?

As noted above, the submission of an erroneous question can be harmful if it confuses or misleads the jury in answering a question that is properly submitted and material to the judgment. *Alvarado*, 897 S.W.2d at 752; *Boatland of Hous.*, 609 S.W.2d at 750. Richard argues that any error in the charge was harmless because there was sufficient evidence to support a conclusion that the share issuance was not fair to PMI and, thus, to support the jury's "no" answer to Question 4. In other words, Richard contends that, because there is some evidence from which the jury could have found that the share issuance was not fair to PMI, the submission of questions about Richard's informal-fiduciary-

---

[13] The Estate also argues Question 4 was improper because (1) it asked a question of law and (2) it should have specified May 1, 2015, as the date for determining whether the share issuance was fair to PMI. In light of our conclusion that the instructions accompanying Question 4 were erroneous, we do not need to address these additional challenges to Question 4. Their resolution would not change our ultimate disposition. We note, however, that the determination of whether the share issuance was fair to PMI when it was authorized would necessarily include evidence of the shares' purchase price, which some evidence suggests was not determined until May 5, 2015.

duty claim and the inclusion of inapplicable predicates to Section 21.418(b)'s safe-harbor defense was harmless.

We disagree. The jury's deliberations on Question 4 should have focused solely on whether the share issuance was fair to PMI at the time it was authorized, approved, or ratified by Dick. *See* TEX. BUS. ORGS. CODE § 21.418(b)(2). But due to the erroneous submission of the informal-fiduciary-duty theory, a significant amount of Richard's evidence and argument regarding the share issuance focused on its alleged unfairness to *Richard*. Richard testified that he had been groomed to take over the family business from a young age, and he told the jury that the share issuance "upset the applecart" and "cut [him] out." He told the jury he doubted that the signature on the check to pay for the shares was Dick's and that he believed Dick would not have approved the share issuance. According to Richard's testimony, Dick was always proud of Richard and wanted him to have control of the family enterprise.

Continuing with the theme of unfairness to him, Richard relied heavily on the fact that Dick never told Richard about the share issuance to prove that Dick did not in fact authorize it. Petitioners were each asked repeatedly by Richard's counsel about the fact that Richard was not notified of the share issuance until after Dick had died. In response, petitioners vigorously disputed Richard's claim that PMI's bylaws required advance notice of the issuance to Richard. The probate court decided to let counsel "duke it out" for the jury, and they did, making the notice issue a focus of the trial.

25

In closing argument, Richard asserted that his failure to receive notice of the share issuance meant that the share issuance was not fair. But he conflated the proper inquiry (fairness to PMI) with the improperly submitted one (fairness to Richard), arguing that "the corporation that is PMI, is Richard" and that the share issuance "is not fair to the one person that [PMI] was organized for. That is [Richard]." In short, Richard leveraged the probate court's errors to admit prejudicial evidence under an improperly submitted theory and to mislead the jury's deliberations regarding Question 4 by conflating the transaction's fairness to Richard with its fairness to PMI.

Whether the share issuance was fair to PMI was the critical question. And the evidence on this was sharply conflicting. As the court of appeals noted, "[b]oth sides presented voluminous and competing expert testimony about the market value of PMI." 591 S.W.3d at 630. Richard's expert testified that the market value of the new shares was approximately $5.6 million, or nearly double the $3.2 million Dick paid. But the Estate's expert testified that the fair value of PMI at the time of the share issuance was between $2.8 and $3.6 million. And petitioners presented evidence that, a year before the share issuance, Richard certified in his personal financial statement that PMI's total value was $5.6 million, which would make a purchase of 52.4% of the corporation worth approximately $2.9 million, or less than the $3.2 million Dick paid.

The evidence on price, which should have been a key issue in the jury's determination of fairness to PMI, was hotly contested. The jury returned a 10–2 verdict. And the probate court erred both in submitting

three questions relating to an improper informal-fiduciary-duty theory and in providing superfluous instructions on the fourth. Based on our review of the record and considering the probable effect of the probate court's errors on the minds of the jury, we conclude that the probate court's errors probably caused the rendition of an improper judgment. TEX. R. APP. P. 61.1(a).[14]

### III.    Conclusion

The probate court improperly submitted an invalid theory of liability—Richard's claim that Dick owed him an informal fiduciary duty to manage PMI in a manner that was consistent with Richard's best interest. We reverse and render judgment that Richard take nothing on this claim.

The improper submission of this theory, along with the probate court's erroneous charge on the Estate's Section 21.418(b) defense, allowed Richard to introduce evidence and argument that misled and confused the jury with respect to whether the share issuance was fair to PMI when it was authorized. We conclude these charge errors probably caused the rendition of an improper judgment. We therefore reverse the court of appeals' judgment affirming the probate court's judgment for Richard on his formal breach of fiduciary duty claim.

---

[14] Petitioners also argue that the probate court erred by admitting evidence regarding (1) PMI's bylaws, (2) the attempt to terminate the Dick Poe Toyota dealership, and (3) Richard's abandoned claim that Dick was incompetent. In light of our disposition remanding the case for a new trial based on the probate court's charge errors, we do not address the merits of these arguments.

27

We affirm the court of appeals' judgment with respect to Richard's claims against Bock, Castro, and Sergent individually.

We remand the case to the probate court for further proceedings.

Rebeca A. Huddle
Justice

**OPINION DELIVERED:** June 17, 2022